David M. Lilienstein, SBN 218923
david@dllawgroup.com
Katie J. Spielman, SBN 252209
katie@dllawgroup.com
**DL LAW GROUP**
345 Franklin St.
San Francisco, CA 94102
Telephone: (415) 678-5050
Facsimile: (415) 358-8484

Attorneys for Plaintiffs,
DAN C.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAN C.<br><br>    Plaintiff,<br><br>        vs.<br><br>ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY; DIRECTORS GUILD OF AMERICA—PRODUCER HEALTH PLAN; and DOES 1 through 10,<br><br>        Defendants. | Case No.  2:22−cv−03647−FLA−AFM<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT DIRECTORS GUILD OF AMERICA-PRODUCER HEALTH PLAN'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION**<br><br>Date:         June 9, 2023<br>Time:         1:30 p.m.<br>Courtroom: 6B<br>Location:    350 W. 1st Street<br>                  Los Angeles, CA 90012<br>Judge:        Hon. Fernando L. Aenlle-Rocha |

TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................. 1

II.   defendants' filing of the instant motion for summary judgment violates the scheduling order in this case, is gamesmanship, violates erisa, and flies in the face of principles of fundamental fairness. the court should not consider it ........................................................... 3

  A.   A Single Motion by Defendant For Summary Judgment is Not the Proper Mechanism for Relief in an ERISA Action ................................................................. 3

  B.   The Plan's Motion is Premature as Plaintiff Has Not Had the Opportunity to Conduct Discovery.................................................................................................. 4

    1.   Specific Good Cause Exists Under Rule 56(d), to Deny or Defer Judgment on Defendants' Summary Judgment Motion ............................................... 4

    2.   Defendants Have Provided Non-Substantive Responses to the Written Discovery Plaintiffs Have Already Propounded and Have Refused to Produce a Rule 30(b)(6) Deponent. ................................................................................................. 5

III.  FACTS ............................................................................................... 6

  A.   The Plan Terms ................................................................................ 6

  B.   R.C.'s Treatment Course Prior to Residential Treatment Admission ................. 6

  C.   R.C.'s Treatment at Sandhill Residential Treatment Center and Removal from the Program Due to Safety Concerns ............................................................ 7

  D.   R.C.'s Residential Treatment at Intermountain................................................ 7

  E.   Anthem's Denial of R.C.'s Residential Treatment ....................................... 8

  F.   Plaintiff's Appeal Included Five Letters of Medical Necessity from Treating Providers and Hundreds of Pages of Medical Records Documenting R.C.'s Symptoms ........................... 8

    1.   [Name Redacted] Head of R.C.'s School ................................................ 8

    2.   Bonnie Mark Goldstein, LCSW, PhD ................................................... 9

    3.   Alexis D. Naim, LCSW ................................................................... 9

    4.   Kristen J. Naspo, M.A. ................................................................... 9

    5.   Kurt Wulfekuhler, Ph.D., LPCC .......................................................... 10

    6.   Intermountain Treatment Notes............................................................. 10

  G.   Anthem's Appeal Denial...................................................................... 11

  H.   MRIoA's Denial of R.C.'s Second Level Appeal ........................................ 11

  I.   The Board of Trustees' Adoption of MRIoA's Denial Without Further Review or Application of Medical Necessity Standards ................................................ 12

IV.   argument.......................................................................................... 12

  A.   The Standard of Review is De Novo ....................................................... 12

    1.   Defendant Failed to Properly Delegate Discretionary Authority to the Benefits Committee...................................................................................... 14

    2.   The Grant of Discretionary Authority is Neither Clear nor Unambiguous ............... 14

i

3.    The Benefits Committee failed to Exercise Any Discretionary Authority ................ 15

B.    The Plan Is Not Entitled to Summary Judgment Because There are Genuine Issues of Material Fact Concerning Whether R.C.'s Mental Health Treatment Satisfied the Medical Necessity Criteria in the Plan ........................................................................... 16

1.    A Genuine Dispute of Material Fact Exists Regarding Whether R.C.'s Treatment Was Medically Necessary Under the Terms of the Plan .............................................. 16

2.    R.C. Satisfied the Now-Discredited MCG Guidelines for Residential Treatment ..... 16

C.    Even Under an Arbitrary and Capricious Review, Summary Judgment Should be Denied. ........................................................................................................ 18

1.    The Plan Abused Its Discretion By Failing to Apply Any Medical Necessity Standards or Criteria to Its Review of R.C.'s Claim ............................................. 19

2.    The Plan Abused Its Discretion By Failing to Fairly Engage With the Medical Opinions and Evidence From R.C.'s Treating Professionals ................................... 20

D.    Defendants' Motion for Summary Judgment on Plaintiff's 502(a)(3) Claim Should be Denied ........................................................................................................ 21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PLAINTIFF'S OPPOSITION TO**
**MOTION FOR SUMMARY JUDGEMENT**                    **Case No. 2:22-cv-03647-FLA-AFM**

# TABLE OF AUTHORITIES

**Cases**

*Abatie v. Aetna Health & Life Ins Co.,* 458 F.3d 955, 963 (9th Cir. 2006) ..... 14, 19

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).................................... 4

*Anderson v. Suburban Teamsters of N. Ill. Pension Fund Bd. Of Trustees,* 588 F.3d 641 at 649 (9th Cir. 2009)............................................................................... 19

*Andrew C. v. Oracle Am. Inc. Flexible Benefit Plan,* 474 F. Supp. 3d 1066, 1083 (N.D. Cal. 2020) ........................................................................................... 21

*Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834................................ 20

*Booton v. Lockheed Medical Benefit Plan (Aetna),* 110 F.3d 1461, 1463-4 (9th Cir. 1997)............................................................................................................. 20

*Conkright v. Frommert,* 559 U.S. 506, 521 (2010)............................................... 19

*D.K. v. United Behavioral health,* __ F.4th __, 2023 WL 3443353, at *8 (10th Cir, May 15, 2023)................................................................................................ 21

*Family Home and Finance Center v. Federal Home Loan Mortgage Corp.,* 525 F.3d 822, 827 (9th Cir. 2008)............................................................................ 5

*Hancock v. Aetna Life Ins. Co.,* 251 F.Supp.3d 1363 (W.D. Wash. 2017)........... 22

*Kearney v. Standard Ins. Co.,* 175 F.3d 1084 (9th Cir. 1999) .............................. 4

*Moyle v. Liberty Mut. Retirement Benefit Plan,* 823 F.3d 948, 961 (9th Cir. 2016) ..................................................................................................................... 22

*Nissan Fire & Marin Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1105-1106 (9th Cir. 2000)................................................................................................................. 5

*Salomaa v. Honda Long Term Disability Plan,* 642 F.3d 666 (9th Cir 2011)....... 21

*Salomaa,* 642 F.3d at 679 ................................................................................... 21

Sections 1132(a)(1)(B) ...................................................................................... 22

*State of Cal., on Behalf of Cal. Dept. of Toxic Substance Control v. Campbell,* 138 F.3d 772, 779 (9th Cir. 1998).......................................................................... 5

*Walker v. American Home Shield Long Term Disability Plan,* 180 F.3d 1065 (9th Cir. 1999).......................................................................................................... 4

**Statutes**

29 U.S.C § 1104 .............................................................................................. 23

29 U.S.C § 1132(a)(1)(B) .................................................................................. 3

29 U.S.C § 502(a)(3) ..................................................................................... 2, 22

29 C.F.R. § 2560.503-1 (h)(2)........................................................................... 20

29 C.F.R. § 2560.503-1 (h)(2)(iv)(3)(ii).............................................................. 20

29 U.S.C. § 1105(c)(1)...................................................................................... 14

Cal. Health & Saf. Code § 1374.721(b) ............................................................. 17

Cal. Health & Saf. Code §§ 1374.72, *et seq* ...................................................... 17

**PLAINTIFF'S OPPOSITION TO**
**MOTION FOR SUMMARY JUDGEMENT**                    **Case No. 2:22-cv-03647-FLA-AFM**

Cal. Health & Saf. Code §§ 1374.72, *et seq.* ........................................................ 17
Cal. Ins. Cod. §§ 10144.5, *et seq.*........................................................................ 17
Cal. Ins. Code § 10144.52(b) ................................................................................ 17
ERISA §405 ........................................................................................................... 15
ERISA §502(a)(3)..................................................................................................... 2
ERISA §502(a)(1)(B) ............................................................................................... 4
FRCP 56(D)........................................................................................................... 13
Health and Safety Code § 1374.721 ...................................................................... 12
Ins Code. §10110.6................................................................................................ 12

**Other Authorities**

MCG guidelines 24th edition, Residential Behavioral Health Level of Care, Child,
    or Adolescent (ORG: B-902-RES) .................................................... 8, 16, 18, 19
Senate Bill 855 ..................................................................................................... 17

**Rules**

*de novo* standard of review ........................................................................... 13, 14

**PLAINTIFF'S OPPOSITION TO
MOTION FOR SUMMARY JUDGEMENT**                    **Case No. 2:22-cv-03647-FLA-AFM**

## I.   INTRODUCTION

Trial briefs in this ERISA action are not due for months, but in an alarming act of gamesmanship Defendant the Directors' Guild of America—Producer Health Plan ("The Plan") has filed the instant motion for summary judgment.  This blatant attempt to deprive Plaintiff of his opportunity to file both opening and responsive briefs, under Rule 52, undermines both fundamental fairness and the generally accepted procedures for litigating ERISA actions.  Further, there remain discovery disputes yet to be resolved. Accordingly, Plaintiff respectfully requests the Court vacate Defendant's motion, or in the alternative deny Defendant's motion pursuant to FRCP 56(d) and allow time for further discovery.

Defendant's tactic is all the more riddled with bad faith given the obvious and self-evident questions of fact herein. Defendant denied medically necessary mental health treatment for a nine-year-old boy who, while in treatment, was caught with another boy "touching each other's private parts and sucking on them" and who was threatening to kill someone by stabbing them in the heart with a knife.  Amazingly, Defendant contends that R.C. displayed no evidence of aggressiveness or risk of harm to others.  Equally alarming is Defendant's incompetence regarding its duty to engage in a meaningful dialog with Plaintiff and to provide a full and fair review of all claims.  For example, instead of discussing the initial denial decision and explaining what evidence could be provided to perfect his claim, Plaintiff received a one-sentence denial that R.C. "was not a danger to [him]self or others." The next denial letter repeated the same language.  Only in the final denial, when it was too late, did Defendant actually provide a medical analysis.  Defendant also ignored letters detailing the underlying medical necessity, and never explained its divergence with the reasoned opinions of the medical professionals most familiar with R.C. treatment. Making matters worse, Defendant concedes it has no medical expertise to properly evaluate mental

**PLAINTIFF'S OPPOSITION TO MOTION**
**FOR SUMMARY JUDGEMENT**                                    **Case No. 2:22-cv-03647-FLA-AFM**

health claims, and instead relied on a third party vendor that never disagreed with the denial of a claim for mental health care at a residential treatment center. The cozy relationship between Defendant and its chosen reviewer, and the ensuing bias this creates, warrants extreme skepticism and further discovery. It also explains why Defendant allowed a claim for sub-acute mental health care to be decided on the basis of acute criteria.

Defendant's hope is that it will be saved by the abuse of discretion standard of review. Yet the standard of review analysis only applies to Plaintiff's ERISA 502(A)(1)(B) claim for benefits. It does not apply to Plaintiff's ERISA 502(a)(3) claim for breach of fiduciary duty, for which court's use the reasonably prudent person standard. Here no reasonably prudent person would deny treatment for, and would actually send back home, a nine-year-old boy who was engaging in the activities described above. As to the claim for benefits, the proper standard is *de novo*, because, inter alia, there never was a valid delegation of discretionary authority to any of the many decisionmakers herein. Regardless of the standard of review the volume of evidentiary support for R.C.'s claims, plus the many ERISA procedural and substantive claims violations all warrant denying summary judgment.

Finally, Defendant's gross abdication of its fiduciary duties to Plaintiff--the ERISA statutes were designed to protect plan participants, not injure them--alone warrants relief under ERISA §502(a)(3). It all-too-tight relationship with third party medical reviewers, and the ensuing bias--as evidenced by a 100% denial uphold rate--needs to change. All of this is more properly explored at trial and during oral argument, and not on a summary judgment motion.

II.   **DEFENDANTS' FILING OF THE INSTANT MOTION FOR SUMMARY JUDGMENT VIOLATES THE SCHEDULING ORDER IN THIS CASE, IS GAMESMANSHIP, VIOLATES ERISA, AND FLIES IN THE FACE OF PRINCIPLES OF FUNDAMENTAL FAIRNESS.  THE COURT SHOULD NOT CONSIDER IT**

Defendants filed their motion over three months before the August 11, 2023 deadline to file and exchange opening trial briefs.  The timing of this filing is a transparent attempt seek undue advantage against plaintiff.

A rule 56 motion for summary judgment such as this is improper in an ERISA action, *a fortiori*, when the Court has already set a date and briefing schedule for a Rule 52 bench trial.

The only notice counsel for Defendants provided Plaintiff was an e-mail stating Defendants were filing their summary judgment motion in a week.  Counsel for Plaintiff responded and conducted a meet and confer telephone call and pointed out that defendants' filing of such a motion would violate the scheduling order as well as this court's standing order that parties may not file cross motions for summary judgment. Plaintiff has the burden, which is why ERISA actions are determined, as this Court ordered, on a bench trial on the administrative record with opposing trial briefs. Counsel for Plaintiff further pointed out that the only legal issue ripe for determination at this stage of the action is the applicable standard of review for Plaintiff's (a)(1)(B) claim.  Counsel for the Plan refused to limit their motion for summary judgment to the legal question of the standard of review, or to otherwise withdraw this very premature motion.  See Lilienstein Decl. ¶ 13-15.

In light of the above conduct by Defendants, Plaintiff respectfully requests the Court issue an Order vacating Defendants' summary judgment motion.

A. **A Single Motion by Defendant For Summary Judgment is Not the Proper Mechanism for Relief in an ERISA Action**

A district court may not weigh evidence when considering a motion for summary judgment under Rule 56.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). A district court may, however, weigh evidence when considering a motion for judgment under Rule 52(a). *See Kearney v. Standard Ins. Co.*, 175 F.3d 1084 (9th Cir. 1999) (reversing summary judgment on ERISA claim for benefits where triable issue of fact existed, remanding with instructions to make findings of fact under Rule 52(a)); See *also Walker v. American Home Shield Long Term Disability Plan*, 180 F.3d 1065 (9th Cir. 1999) ("Prior to *Kearney* . . . district courts often granted summary judgment in the face of conflicting evidence. In light of the decision in *Kearney*, however, remand for a bench trial is now required if there is "a genuine issue of material fact as to whether [the party seeking benefits under ERISA] is disabled in the sense defined by the policy.").

 Because Plaintiff brings an ERISA section 502(a)(1)(B) denial of benefits claim against defendants, the trial in this matter is a quasi-administrative review conducted as a Rule 52 bench trial, set for September 12, 2023.

Defendants' motion asks the court to weigh the evidence contained in the over 6,000-page administrative record to decide whether R.C.'s residential mental health treatment was medically necessary. Thus, Defendants' summary judgment motion is tantamount to a trial brief in this ERISA action, and is both entirely premature and inappropriate as a Rule 56 motion.

Plaintiff respectfully requests that the vacate the instant motion.

**B. The Plan's Motion is Premature as Plaintiff Has Not Had the Opportunity to Conduct Discovery**

**1. Specific Good Cause Exists Under Rule 56(d), to Deny or Defer Judgment on Defendants' Summary Judgment Motion**

The Plan has gone to great lengths to refuse to produce discovery directly relevant to Plaintiff's claims. See Lilienstein Decl. ¶¶ 2-12. Because the discovery process in this action is not yet complete, due to the Plan's ongoing refusal to provide simply, straightforward responses to Plaintiff's limited discovery requests, Plaintiff requests that the Court deny Defendants' motion for summary judgment

to allow time to obtain the relevant discovery pursuant to Fed. R. Civ. P. 56(d). See *Nissan Fire & Marin Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1105-1106 (9th Cir. 2000). (Stating that "[t]he nonmoving party, of course, must have had sufficient time and opportunity for discovery before a moving party will be permitted to carry its initial burden of showing that the nonmoving party has insufficient evidence").

The discovery Plaintiff seeks, which primarily relates to the standard of review in this action, the Plan's breaches of its fiduciary duties through its wholesale reliance on a conflicted third-party reviewer, Medical Review Institute of America ("MRIoA"), satisfies the requirements set forth in *State of Cal., on Behalf of Cal. Dept. of Toxic Substance Control v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998); *Family Home and Finance Center v. Federal Home Loan Mortgage Corp.*, 525 F.3d 822, 827 (9th Cir. 2008). Plaintiff's good cause is set forth in the concurrently filed declaration of David Lilienstien, and is summarized briefly below.

> **2.    Defendants Have Provided Non-Substantive Responses to the Written Discovery Plaintiffs Have Already Propounded and Have Refused to Produce a Rule 30(b)(6) Deponent.**

On September 14, 2022, Plaintiff propounded written discovery on the DGA. Lilienstein Dec. ¶2. DGA's responses, originally served on October 14, 2022, consisted mostly of objections. Plaintiff was forced to file multiple motions in order to get even a minimal amount of compliance from DGA. See Dkts. 47, 49, 50, 55, 60. On March 2, 2023, DGA finally produced supplemental responses to Plaintiff's interrogatories and document requests. Lilienstein Dec. ¶7.

DGA's written discovery responses, however, were non-responsive and evasive to multiple questions that bear directly on the questions at issue herein, specifically, the extent to which the Board of Trustees, the benefits committee, and the medical director of the Plan actually exercised any discretion in rubber stamping Anthem and MRI's denial of RC's mental health treatment. Id. ¶¶7-9.

**PLAINTIFF'S OPPOSITION TO MOTION**
**FOR SUMMARY JUDGEMENT**                          **Case No. 2:22-cv-03647-FLA-AFM**

III.   **FACTS**

**A.  The Plan Terms**

The Plan states that the one entity, the Board of Trustees, shall have sole, complete and absolute discretionary authority to decide claims. SUF 109.  The Plan provides coverage for residential treatment.   SUF 110. The Plan covers medically necessary treatment that conforms to plan requirements.  SUF 21, 22. The Plan guarantees coverage for medically necessary treatment and services. SUF 24, 113.

The Plan further states:

"The Benefits Committee shall have the following authority and responsibilities:

…

c. Approving benefits awards, and hearing and determining claims appeals." SUF 116.

**B.  R.C.'s Treatment Course Prior to Residential Treatment Admission**

R.C. was born in a poor suburb of Port-au-Prince, Haiti. His mother died when he was one month old. His father and family were unable to care for him. R.C. suffered from malnutrition and was placed in an orphanage. SUF 29.  At the age of three, Dan C. and J.C. adopted R.C. By the age of five he was attending outpatient therapy and has subsequently been in nearly every form of outpatient therapy. His diagnoses include (1) reactive attachment disorder, (2) developmental trauma, (3) disruptive mood dysregulation disorder, (4) generalized anxiety disorder, and (5) ADHD. SUF 32, 136, 147.

R.C. displayed violent and destructive behavior in pre-school. He frequently ran out of class, and threw objects at peers. SUF 141. He punched his sister hard enough to draw blood. SUF 31.  Another time he crawled to the top of a play structure, refused to come down and said he wished his teacher's children dead. SUF 42. He was violent to

family members, attacked them physically, and also tried to hurt them by destroying objects they valued. Id.

His struggles at school (third grade) continued during the pandemic, when his cycles of anger, destruction, and violence escalated. On July 1, 2020, at the recommendation of all of his treatment providers, R.C. was admitted to Sandhill Center Residential Treatment Program ("Sandhill"). R.C. was only nine years old. (DGA 86).

### C. R.C.'s Treatment at Sandhill Residential Treatment Center and Removal from the Program Due to Safety Concerns

It only took three weeks for the Sandhill facility to realize it was not equipped to deal with the severity of R.C.'s condition. SUF 148. For example, the nine-year old R.C. was discovered having oral sex repeatedly with one of his male roommates. SUF 53, 148. He had quickly discovered a way to engage in these sex acts outside the view of the security cameras. *Id.* Sandhill told Dan C. that R.C. needed to leave the facility immediately. *Id.* At the time of R.C.'s discharge, he "continued to need [] a residential care level of services." *Id.*

### D. R.C.'s Residential Treatment at Intermountain

R.C. then was admitted to Intermountain, where his lack of impulse control and sexualized behavior continued. SUF 151. Intermountain's Intake Assessment noted R.C.'s current risk factors as "sexual reactive behaviors" along with other current and historical risk factors including "increasing agitation, increasing anxiety, loss of important person, significant worsening of family functioning." SUF 150. Intermountain records showed daily problems and an inability to function at home that has lasted 12 months. SUF 152.

On 8/20/2020, R.C. attempted to sneak out of his room and into a peers' room. SUF 157. On 9/29/2020, R.C. threatened to "kill everyone in the cottage" and said that another patient, "MH made that noise and I am going to stab him in the heart with a knife." SUF 163.

On 11/24/2020, R.C. punched a staff member in the stomach.  During the altercation, R.C. "told in detail how he was going to kill his cottage peers and their families. He described disemboweling them and sneaking into their rooms at night to kill them. He told them he knows where they all live and he will kill everyone in their family."  R.C. claimed he was "Messiah" and was hearing "God within his head". SUF 171 (DGA 1191-1192).

The Intermountain treatment notes include over a dozen incident reports of physical attacks on staff, sexual aggression toward peers and staff, and examples of R.C.'s general inability to care for himself. SUF 164. Despite this, both Anthem and the Plan agreed that it was safe for R.C. to return home.

### E.  Anthem's Denial of R.C.'s Residential Treatment

Defendants approved R.C.'s admission to and treatment at Intermountain—for a whopping three days. SUF 55. Anthem then denied any further Intermountain treatment, based on internal proprietary medical necessity criteria called the MCG Guidelines.  SUF 75, 92, 126, 128 The specific guidelines Anthem used were the MCG guidelines 24th edition, Residential Behavioral Health Level of Care, Child, or Adolescent (ORG: B-902-RES).[1]

The denial letter states in relevant part that: "**The information we have does not show you are a danger to yourself or others**. For this reason, the request is denied as not medically necessary."
(SUF 117-118, emphasis added)

### F.  Plaintiff's Appeal Included Five Letters of Medical Necessity from Treating Providers and Hundreds of Pages of Medical Records Documenting R.C.'s Symptoms

Plaintiff submitted a 2000+ page appeal, including five separate letters of medical necessity from R.C.'s treating providers.

####     1.    [Name Redacted] Head of R.C.'s School

---

[1] Plaintiff included a complete copy of these guidelines in his appeal, which may be found in the administrative record at DGA_DC 000207-218.

[Name Redacted], the Head of School at R.C.'s primary school, wrote a letter documenting the intractable struggles R.C. faced prior to residential treatment, and his need for ongoing care because R.C. was unable to regulate his behavior and emotional responses, did not understand how to react appropriately, and "requires continued therapeutic treatment to assist him in identifying his emotions and to acquire the necessary tools to navigate successfully in the world the surrounds him.  SUF 127-39.

2. **Bonnie Mark Goldstein, LCSW, PhD**

Dr. Goldstein was R.C.'s individual and family therapist for over a year before he entered residential treatment. SUF 41.  Dr. Goldstein wrote of her "extreme concern about his [R.C.'s] wellbeing" and that while she

> initially thought that [R.C.'S] challenges could be addressed during our weekly sessions in outpatient treatment, I came to recognize that his challenges are more global.  **Each area of his life is affected**; . . .
>
> I quickly determined that t**he level of care the family could provide would not be sufficient to protect family members."** … Given the persistence of his symptoms over the years, with increasing severity, **a residential level of care is necessary to achieve significant and lasting improvement.**"

SUF 140-141.  (emphasis added)

3. **Alexis D. Naim, LCSW**

Alexis Naim was Dan C. and J.C.'s marital and family therapist.  Ms. Naim wrote that "…over the course of several years working with his [R.C.] parents and having also met with his siter [omit], it has been markedly evident that [R.C.]'S behavioral challenges and emotional difficulties became impossible to safely manage at home with outpatient treatment."  She explained that R.C.'s "…episodes of violence and reactivity at home increased and it became **clear that residential treatment was mandatory.**" SUF 142-143.

4. **Kristen J. Naspo, M.A.**

Kristen Naspo is an educational consultant SUF 41. Ms. Naspo wrote that R.C.'s current placement in residential treatment at Intermountain was, in her professional

opinion "where he needs to be and lend my support for this placement as is." She further stated that "when students have the history that [R.C.] has, this isn't something that is a quick fix."  SUF 144-145.

### 5.   Kurt Wulfekuhler, Ph.D., LPCC

Dr. Kurt Wulfekuhler is the clinical director at Sandhill Child Development Center, where R.C. was being treated immediately prior to his admission to Intermountain. Dr. Wulfekuhler also strongly recommended continued residential treatment for R.C., after he had to be discharged from the program at Sandhill due to engaging in "sexually inappropriate behavior" with another patient at the program, including "touching each other's private parts and sucking on them."  SUF 146-148. R.C. was just nine years old.  This was unfortunately not R.C.'s only documented instance of inappropriately sexualized behavior – concerns with R.C.'s inappropriate sexual conduct was documented many times during his subsequent treatment at Intermountain.  (SUF 155-159).

Dr. Wulfekuhler added:

> "It was our strong recommendation at the time of discharge that [R.C.] continued to need the services of a residential care level of services, specifically with an RTC that provided a single room." *Id.*

### 6.   Intermountain Treatment Notes

Plaintiff's appeal also included hundreds of pages of treatment notes from R.C.'s residential treatment center, Intermountain.  Those treatment notes documented R.C.'s history of difficulty functioning at home and at school for a period of at least 12 months prior to his admission (SUF 152) and his continued struggles with functioning during treatment. *Id.*  The Intermountain treatment notes also documented R.C.'s history of inappropriate sexual behavior, and his continued problems with sexualized behavior and attempts to engage in sexual activities with his peers at Intermountain.  Incidents while at Intermountain included sneaking out of his room at night and into a peer's room (SUF 157).  The intermountain treatment notes submitted in Plaintiff's appeal also

documented R.C.'s history and ongoing incidents of anger and violence towards others. Such incidents included hitting a staff member on 9/4/2020 (SUF 160), grabbing an alarm clock as if he was going to hit two peers on 9/25/2020, pushing a table at adults and picking up a stool while posturing as if he was going to hit another individual on 9/25/2020. SUF 162.  On 9/29/2020 R.C. said that he was going to "kill everyone in the cottage" and that he would "stab them with a knife, including whoever made that noise." SUF 163. He then specifically threatened to stab the patient who made the noise in the heart with a knife. *Id*.

### G. Anthem's Appeal Denial

Anthem denied Plaintiff's appeal.  Anthem did not address any of the medical providers' letters or recommendations submitted with Plaintiff's appeal, nor any of the thousands of pages of medical records.  Rather, Anthem stated that "after the treatment you had, **you were no longer at risk for serious harm that needed 24 hour care.** SUF 169. You could have been treated with outpatient services. *Id*.  We based this decision on the MCG guideline Residential Behavioral Health Level of Care, Child and Adolescent (ORG: B-902-RES)." *Id*

### H. MRIoA's Denial of R.C.'s Second Level Appeal

Plaintiff submitted his second level appeal to the Plan. However, the Plan did not review Plaintiff's appeals. Instead, it submitted both appeals to a third-party reviewer, MRIoA. MRIoA submitted two terse reports, dated 6/15/20 and 7/11/20, denying both of Plaintiff's appeals. SUF 167. MRI's first report gives only the following denial rationale:

> By the DOS 08/07/20 there was no ongoing evidence of persistent risk of harm to self or others, no significant aggression or threatening behavior, and no evidence of serious impairment of daily functioning. The patient is noted to require frequent redirection, but this level of service does not require 24 hour a day monitoring and support. In addition, there is no evidence of severity of depression or mania, as well as no evidence of a thought disorder that would require residential services . . . Therefore, there is no medical necessity for continued RTC LOC . . .

11

SUF 168.

This rationale lacks reference to any of the medical evidence and contains virtually no analysis. SUF 169. The same is true with the later MRI report, which added little analysis.  SUF 170.

### I.  The Board of Trustees' Adoption of MRIoA's Denial Without Further Review or Application of Medical Necessity Standards

Once MRI upheld the Anthem denial the claims administration process was effectively over. It is unclear whether the Plan's medical director or its Benefits Committee (whom the Plan contends makes benefits determinations) even read the entire MRI report much less reviewed any of the underlying medical records or appeal documents.  The Plan provided no documents in the administrative record that showed the Plan contributed any analysis to Plaintiff's claims beyond MRI's cursory reports. SUF 181. The Plan concedes that no member of its Benefits Committee is trained in mental health. SUF 180.  In reality, the medical director rubber-stamped the MRI uphold, thereby denying Plaintiff a full and fair review of his appeal, as required under ERISA. SUF 182.

### IV.  ARGUMENT

#### A.  The Standard of Review is *De Novo*

At the outset it should be noted that California law strongly disfavors the use of discretionary clauses in ERISA benefits actions. In fact, they have been banned in all but a narrow sliver of cases.  See, e.g. Ins Code. §10110.6 (banning discretionary clauses in disability policies); Health and Safety Code § 1374.721 (banning discretionary clauses in health insurance policies).  The only loophole to these bans is for self-funded plans—including the plan herein—which use insurers to decide claims but which are not considered to be insurance.

In fact, Defendant's entire approach to this and other litigation involving denials of residential treatment claims for mentally ill youth is that the abuse of discretion standard of review effectively puts its claims handling beyond scrutiny.

This is precisely the type of arrogance that resulted in Defendant's attempted end-around the briefing schedule in this case.  Only because the health plan at issue herein is self-funded does Defendant avoid the otherwise blanket restrictions on discretionary review.

Here the evidence demonstrates that the standard of review herein should be *de novo* because 1) there was no actual delegation of discretionary authority from the Plan Trustees to the Benefits Committee under the procedures set forth in the plan documents; 2) any purported delegation of discretionary authority to the Benefits Committee  is neither clear nor unambiguous; 3) the Benefits Committee and its medical director admittedly have no expertise whatsoever regarding mental health claims, failed to exercise any discretion and merely rubber stamped the report of their third-party vendor, Medical Review Institute of America; and 4) Defendant's contention that both Anthem and MRIOA themselves somehow had discretionary authority to deny claims is a laughable overreach.

To the extent the abuse of discretion standard of review could be found to apply, substantial skepticism is warranted on the basis 1) of the Plan's many procedural violation of ERISA's claims handling requirements and 2) because of MRIOA's bias in favor of its repeated client, the Plan, which was somehow unable to find once instance of the MRIOA overturning a denial of residential center claim out of seventeen separate reviews over the past few years.  Defendant's motion has prevented Plaintiff from conducting additional the bias of this third-party vendor, and Plaintiff respectfully requests leave under under FRCP 56(D) to conduct additional discovery on this issue.

Finally, Plaintiff again notes the impropriety of Defendant's gamesmanship in filing the instant motion, months ahead of a briefing schedule that, as is standard practice in ERISA actions, would allow both parties opening and responsive briefs.  For this reason alone Defendant's motion should be denied and or vacated.

### 1. Defendant Failed to Properly Delegate Discretionary Authority to the Benefits Committee

ERISA states in pertinent part:

> The instrument under which a plan is maintained may *expressly provide* for procedures (A) for allocating fiduciary responsibilities (other than trustee responsibilities) among named fiduciaries, and (B) for named fiduciaries to *designate persons other than named fiduciaries* to carry out fiduciary responsibilities.

29 U.S.C. § 1105(c)(1).   Any grant of discretionary authority must be clear and unambiguous.  See *Abatie v. Aetna Health & Life Ins Co.,* 458 F.3d 955, 963 (9th Cir. 2006).  Here the Plan failed to follow its own internal procedures, and its purported delegation of discretionary authority to the Benefits Committee is neither clear not unambiguous.

Defendant attempts to parse together language from disparate parts of the Trust Agreement and the Summary Plan Description as evidence that the Benefits Committee had discretionary authority to deny the claims at issue herein.  Yet Defendant conveniently omits the most important plan language of all. According to Article IV Section 9 of the Trust Agreement, any allocation and delegation of the Plan Trustees' decisionmaking authority must be made "by resolution duly adopted . . . ."  Here the procedure is contemplated but not followed. Defendant fails to quote this plan language because Defendant offers no evidence of any resolution by the Trustees delegating discretionary authority to the Benefits Committee. Defendant also fails to offer evidence that this nonexistent resolution was ever duly adopted. For this very basic reason, the standard of review is de novo.  At a minimum, these failures create a question of fact that Defendant failed to meet its burden to shift from the default de novo standard of review.

### 2. The Grant of Discretionary Authority is Neither Clear nor Unambiguous

Even if the Court finds a proper delegation of authority by the Plan Trustees to the Benefits Committee, the only authority that was delegated was decisionmaking authority, not discretionary authority to construe plan terms. There is no question that the Plan Trustees delegated claims-handling authority to the Benefits Committee.  But that is all that was—decisionmaking authority.

Defendant relies on language that a decision by the Benefits Committee is akin to a decision by the Plan Trustees, but this requires a logical jump, and going back and forth between different sections of the trust document, piecemeal, to final any actual, explicit grant of discretionary authority.  Further complicating things is Section 2, entitled Allocation and delegation of Authority.  That section references ERISA §405, which only addresses the role and potential liability of fiduciaries, and the delegation of fiduciary responsibilities. Nowhere does this section even contemplate delegation of discretionary authority applicable to the standard of review to be used in litigation.  The statement that the Benefits Committee's claims decision are as final as the Plan Trustees is a commonsense statement.  It is a far from a clear and unambiguous grant of actual discretionary authority, however.

### 3.   The Benefits Committee failed to Exercise Any Discretionary Authority

As a separate basis, the Court could easily conclude that the Benefits Committee exercised no discretion at all.  By Defendant's own admission in discovery, neither the Benefits Committee nor its medical director have any expertise whatsoever in handling mental health claims.  This begs the question of how an entity of group that is incapable with no medical training to determine medical necessity could possibly warrant deferential review of a claim decision denying that same medical necessity.

The answer is the actual review and medical necessity decision was made by a third-party vendor, MRIOA. Try as it might to suggest otherwise, Defendant

**PLAINTIFF'S OPPOSITION TO MOTION**
**FOR SUMMARY JUDGEMENT**                                    **Case No. 2:22-cv-03647-FLA-AFM**

cannot in good faith claim that MRIOA's decision to uphold Anthem's claim denial is subject to the abuse of discretion standard of review.  Any suggestions to the contrary are patently baseless and devoid of any clear and unambiguous discretionary grant in any plan document. Thus, since the actual claims decision was made by MRIOA and then rubber-stamped by the Benefits Committee, and since it is the MRIOA determination that is at issue herein, no deference is appropriate.  At best, the Benefits Committee communicated MRIOA's denial rationale to Plaintiff and his family, but that is not a discretionary act.

### B. The Plan Is Not Entitled to Summary Judgment Because There are Genuine Issues of Material Fact Concerning Whether R.C.'s Mental Health Treatment Satisfied the Medical Necessity Criteria in the Plan

#### 1. A Genuine Dispute of Material Fact Exists Regarding Whether R.C.'s Treatment Was Medically Necessary Under the Terms of the Plan

The Plan contends that its decision was supported by "two qualified medical expert reports performed by a qualified and independent physician, in addition to the two expert reviews performed by Anthem's reviewing physicians."  An examination of these "expert reports" and "expert reviews" shows that they were pro forma, conclusory, failed to engage with any of the voluminous medical evidence or treating providers' letters stating why R.C.'s treatment was medically necessary.  These experts never once spoke with R.C., his parents, or his providers  and are contradicted many times over by the evidence in the administrative record.

#### 2. R.C. Satisfied the Now-Discredited MCG Guidelines for Residential Treatment

The MCG Guideline have been found by numerous courts to violate generally accepted standards of care in the medical community by, *inter alia*, (1) overemphasizing acuity and crisis stabilization over effective treatment of the patient's underlying condition, (2) failing to address the effective treatment of co-occurring conditions, (3) failing to err on the side of caution in favor of a higher level of care when there is ambiguity. SUF 128. The deficiencies of the MCG Guidelines are so

**PLAINTIFF'S OPPOSITION TO MOTION**
**FOR SUMMARY JUDGEMENT**                    **Case No. 2:22-cv-03647-FLA-AFM**

apparent that, effective January 1, 2021, the California Legislature banned their use by self-funded plans in adjudication of mental health care claims for adolescents. See Senate Bill 855 which amended Health and Safety and Insurance Codes. Cal. Health & Saf. Code §§ 1374.72, *et seq.*; Cal. Ins. Cod. §§ 10144.5, *et seq.* to require insurers and health plans conducting medical necessity analyses on mental health claims to exclusively apply medical necessity criteria developed by nonprofit clinical specialty associations (such as the American Association of Child and Adolescent Psychiatrists (AACP)), and to receive trainings from nonprofit clinical specialty associations in the application of such criteria.  Cal. Ins. Code § 10144.52(b); Cal. Health & Saf. Code § 1374.721(b).  Insurers are not permitted to apply "different, additional, conflicting, or more restrictive utilization review criteria than the criteria and guidelines set forth in [the nonprofit professional association criteria.]" Cal. Ins. Code § 10144.52(c); Cal. Health & Saf. Code § 1374.721(c).

> a.    The MCG Guidelines Required Anthem to Approve Plaintiff's Claim

Anthem's initial denial letter cites the MCG criteria and states that under those criteria residential treatment can be medically necessary for those who are at risk of harm to themselves, or who have a mental condition that is causing serious problems with functioning, among other things.  SUF 117.

Anthem's denial ignored its own criteria. Anthem improperly focused on the first and most extreme component—suicidality. It ignored that coverage is **also** medically necessary if the patient suffers from a mental health condition that causes serious problems with functioning. Indeed, R.C. exhibited nearly *every* symptom that Anthem delineated in its letter. His repeated episodes of impulsive and abusive activity included headbutting and kicking staff, threatening staff with homemade weapons, and threatening peers with murder. Intermountain staff noted that these episodes required no less than **nine** physical interventions requiring them to forcibly restrain R.C. SUF 164, 120, 157, 160, 162, 163, 171, 172.

R.C.'s impulse control was so low that he had engaged in repeated sex acts at his previous facility, and he continued to engage in unwanted sexual behavior at Intermountain—with over a dozen episodes documented in the treatment notes. The treatment notes from Intermountain also reveal how much R.C. struggled with activities of daily living. He frequently urinated on the bathroom floor and struggled to clean himself. SUF 166.  Anthem abused its discretion by not applying the guidelines, which, in this case, support medical necessity.  Under any standard of review, the denial in this case is not supportable.

> **b.**    **The MCG Guidelines Required MRIoA to Approve Plaintiff's Claim**

Plaintiff submitted his second level appeal to the Plan and the Plan submitted the appeal to MRI. SUF 166. MRI submitted two terse reports, dated 6/15/20 and 7/11/20, denying both of Plaintiff's appeals. MRI's first report contends, *inter alia*, that "there was no **ongoing evidence** of **persistent risk of harm to self or others**, no **significant aggression** or **threatening behavior**, and no evidence of serious impairment of daily functioning." SUF 168. (emphasis added).

This rationale lacks reference to any of the medical evidence cited above and contains virtually no analysis.  The same is true with the later MRI report, which states that R.C.'s behavior is only intermittently problematic. SUF 170 This ignores the numerous instances of self-harm and harm to others riddled throughout the Intermountain treatment records. Thus there is, at a minimum, a triable issue of fact as to the Plan/MRI's contention that R.C. suffered only "intermittent difficulty," and whether "there was no ongoing evidence of persistent risk of harm to self or others, no significant aggression or threatening behavior, and no evidence of serious impairment of daily functioning."

**C.  Even Under an Arbitrary and Capricious Review, Summary Judgment Should be Denied.**

The Plan contends that the standard of review that the Court should apply to its decision is abuse of discretion.  Plaintiff disputes that, but even under an abuse of discretion standard of review, Defendants' motion fails.  The Plan argues that its decision is unassailable under an abuse of discretion review.  To the contrary, in reviewing for abuse of discretion, the court considers all of the relevant circumstances in evaluating the decision of the plan administrator. *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955 at 972 (9th Cir. 2006)(en banc).  "Applying a deferential standard of review does not mean that the plan administrator will prevail on the merits.  It means only that the plan administrator's interpretation will not be disturbed if reasonable."  *Id. quoting Conkright v. Frommert,* 559 U.S. 506, 521 (2010).  "A plan administrator abuses its discretion if it renders a decision without any explanation, construes provisions of the plan in a way that conflicts with the plain language of the plan, or fails to develop facts necessary to its determination."  *Anderson v. Suburban Teamsters of N. Ill. Pension Fund Bd. Of Trustees*, 588 F.3d 641 at 649 (9th Cir. 2009).  Here, the Plan is guilty of all of the infractions outlined in *Anderson*.

### 1. The Plan Abused Its Discretion By Failing to Apply Any Medical Necessity Standards or Criteria to Its Review of R.C.'s Claim.

The Plan does not claim to have used any medical necessity guidelines or criteria to evaluate Plaintiff's appeal. Instead, it admits that it simply "deferred to the medical opinions expressed by the specialty of the medical reviews of Anthem and MRI" thereby rendering the appeals process outlined in the Plan illusory. Lilienstein Dec. ¶ 8-9, Exhibit B. Anthem claims to have used the MCG Guidelines (DGA 25-28). MRI claims to have used the MCG Guidelines. But the Plan, the only entity with the "sole, complete, and absolute discretionary authority to . . . make any and all findings of fact, constructions, interpretations and decisions relative to the [Plan], as well as to interpret any provisions of the [Plan] . . .," does not even pretend to have used the MCG Guidelines—or any guidelines whatsoever. SUF 6.

PLAINTIFF'S OPPOSITION TO MOTION
FOR SUMMARY JUDGEMENT                                    Case No. 2:22-cv-03647-FLA-AFM

Although 29 C.F.R. § 2560.503-1 (h)(2)(iv)(3)(iii) permits a fiduciary to "consult" with health care professionals, here the Plan did not merely "consult" with MRI to adjudicate Plaintiff's claim. It "deferred" all decision-making authority to MRI, an entity with no grant of discretion. Indeed, "[t]he Benefits Committee at the time Plaintiff's claim for benefits was determined at the final appeal stage are not in possession of medical credentials, including the following degrees: M.D., R.N., PhD (medical), N.P., or L.C.S.W." Lilienstein Dec. ¶ 4, Exhibit A. In failing to apply any medical analysis whatsoever to Plaintiff's claim, the Plan denied Plaintiff the full and fair review required under 29 C.F.R. § 2560.503-1 (h)(2). This wholesale deference to the original denial is a per se abuse of discretion. A plan will be found not to have provided a claimant with a full and fair review unless it "provide[s] for a review that does not afford deference to the initial adverse benefit determination. . ." 29 C.F.R. § 2560.503-1 (h)(2)(iv)(3)(ii).

## 2. The Plan Abused Its Discretion By Failing to Fairly Engage With the Medical Opinions and Evidence From R.C.'s Treating Professionals

The Plan's denials of R.C.'s residential treatment at Intermountain completely ignored the medical opinion letters submitted by R.C.'s treating providers, as well as the voluminous treatment notes included in R.C.'s appeal. The Plan argues, astoundingly, that Plaintiff's medical necessity letters "have little probative value." While an administrator under ERISA is not required to *defer* to the opinions of a treating physician, it "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834. The Ninth Circuit has repeatedly held that failing to consult the consult the claimant's treating physician is an "inadequate investigation [that does] not provide a reasonable basis for making a determination" to which a Court must defer. *Booton v. Lockheed Medical Benefit Plan (Aetna)*, 110 F.3d 1461, 1463-4 (9th Cir. 1997). This arrogant disregard for medical evidence is simply unacceptable under any version of the

law: "Weighty evidence may ultimately be unpersuasive, but it cannot be ignored." *Salomaa,* 642 F.3d at 679. *See also D.K. v. United Behavioral health,* __ F.4th __, 2023 WL 3443353, at *8 (10th Cir, May 15, 2023). It must engage with the medical opinions provided by its claimant's treating providers. While the Court is not required to give any particular weight to the opinions of medical professionals who treated or personally evaluated the claimant, they cannot "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Andrew C. v. Oracle Am. Inc. Flexible Benefit Plan*, 474 F. Supp. 3d 1066, 1083 (N.D. Cal. 2020) *citing Nord*. In *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir 2011) the Ninth Circuit found that the plan abused its discretion where:

> Its decision was illogical, implausible, and without support in inferences that could reasonably be drawn from facts in the record because (1) every doctor who personally examined [the claimant] concluded that he was disabled; . . . (4) the reasons for denial shifted as they were refuted, were largely unsupported by the medical file, and only the denial stayed constant; and (5) the plan administrator failed to engage in the required 'meaningful dialogue' with [the claimant].

*Salomaa,* 637 F.3d at 967-968.

As set forth above, in addition to the opinions of R.C.'s providers, the daily treatment notes from Intermountain documented R.C.'s ongoing aggression, threatening behavior, and inappropriate sexualized behavior. Incidents while at Intermountain included sneaking out of his room at night and into a peer's room, hitting people, and threatening to kill people. (SUF 152; 153). Each of these incidents occurred weeks after the Plan stated that there was no evidence of risky behavior. (SUF 166; see also SUF 155, 157, 158). The Plan's failure to distinguish these facts is an abuse of discretion.

### D. Defendants' Motion for Summary Judgment on Plaintiff's 502(a)(3) Claim Should be Denied

The Plan argues that it is entitled to judgment on Plaintiff's 502(a)(3) claim for breach of fiduciary duty because it is duplicative of his 502(a)(1)(B) claim, and

because Plaintiff lacks Article III standing.  The Plan is wrong on both issues.  The law in the Ninth Circuit is clear, that "even at the summary judgment stage, a plaintiff may proceed with simultaneous claims under Sections 1132(a)(1)(B) and (a)(3).  *Hancock v. Aetna Life Ins. Co.*, 251 F.Supp.3d 1363 (W.D. Wash. 2017) (citing *Moyle v. Liberty Mut. Retirement Benefit Plan*, 823 F.3d 948, 961 (9th Cir. 2016).  "The appropriate inquiry at this stage is not whether the Section 1132(a)(3) claim would ultimately afford duplicative relief if Ms. Hancock also prevails on her Section 1132(a)(1)(B) claim, but whether there is a genuine dispute of material fact allowing the Section 1132(a)(3) claim to proceed." *Id.*

Here, there are numerous genuine disputes of material facts.  The evidence in the administrative record and the Plan's own discovery responses shows that the Plan used a conflicted and unqualified third-party reviewer, MRI.  MRI issued a report that was so terse and willfully devoid of any engagement with the medical evidence before it concerning R.C.'s history and symptoms, that it appears likely the reviewer did not even read Plaintiff's appeal.  The Plan's own discovery responses acknowledge that it did not review or supervise MRI's decision-making processes or conduct and quality control oversight whatsoever on MRI's conduct.  The Plan breached its fiduciary duty by simply rubber-stamping MRI's denial decision without exercising any independent discretion at all.

The Plan further acknowledged in discovery that neither its medical director nor any of the members of the Board of Trustees or the Benefits Committee have any training, expertise or Board Certification in mental and or behavioral health that would qualify them to deny mental health claims or to opine on medical necessity.  Instead, the Plan farms out all mental health decision-making to MRIoA, and rubber-stamps its decision.  The Plan does not conduct its own medical necessity analysis, and does not even reference any clinical guidelines to evaluate appeals that come before it.  The Plan's failure to discharge it duties, and its failure to hold MRIoA to any standard of care in reviewing claims such as Plaintiffs, is a breach of its fiduciary duties under

ERISA.  (29 U.S.C § 1104).  Defendant's motion for summary judgment on this claim should be denied.

Dated:  May 19, 2023                    Respectfully submitted,
                                        **DL LAW GROUP**


                                        By:   _/S/ David Lilienstein_____
                                         David M. Lilienstein
                                         Katie J. Spielman
                                         Attorneys for Plaintiff, Dan C.


        The undersigned, counsel of record for Plaintiff, Dan C. certifies that this brief contains 6,998, which complies with the word limit of L.R. 11-6.1.

                                        _/s/ David Lilienstein_____
                                        David Lilienstein