David M. Lilienstein, SBN 218923
david@dllawgroup.com
Katie J. Spielman, SBN 252209
katie@dllawgroup.com
**DL LAW GROUP**
345 Franklin St.
San Francisco, CA 94102
Telephone: (415) 678-5050
Facsimile: (415) 358-8484

Attorneys for Plaintiff,
DAN C.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

DAN C.

         Plaintiff,

   vs.

ANTHEM BLUE CROSS LIFE
AND HEALTH INSURANCE
COMPANY; DIRECTORS GUILD
OF AMERICA—PRODUCER
HEALTH PLAN; and DOES 1
through 10,

       Defendants.

Case No.  2:22−cv−03647−FLA−AFM

**PLAINTIFF'S [PROPOSED] FINDINGS OF FACT AND CONCLUSION OF LAW**

Date:      December 13, 2023
Time:     9:00 a.m.
Courtroom: 6B
Location:  350 W. 1st Street
             Los Angeles, CA 90012
Judge:     Hon. Fernando L. Aenlle-Rocha

## I.   INTRODUCTION

This is an action brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") by Dan C. ("Plaintiff" or "Mr. C") against Defendant Directors Guild of America—Producer Health Plan ("Defendant" or "DGA" or the "Plan"). Plaintiff originally included Anthem Blue Cross Life Insurance Company ("Anthem") as a Defendant, but subsequently dismissed Anthem, leaving only Defendant the DGA in this case. (Dkt. No. 99.)

The action concerns a denial of inpatient mental health treatment and care for Plaintiff's son, R.C. Anthem was the claims administrator that initially denied R.C.'s treatment. After several appeals, the Plan, by and through its Benefits Committee, upheld the Anthem denial. The Benefits Committee relied on the conclusions of a third-party vendor, the Medical Review Institute of America ("MRI") which issued two reports upholding Anthem's denial.

Plaintiff brings two counts, one for benefits under 29 U.S.C. §1132(a)(1)(B) ERISA §502(a)(1)(B); and the other for breach of fiduciary duty under 29 U.S.C. §1132(a)(3), ERISA §502(a)(3).

Plaintiff filed an Opening Trial Brief ("POTB") on August 11, 2023. Dkt. 86 (POTB).  Defendants filed Opening Trial Briefs the same day.  Dkts. 84, 85 (DOTB).  The parties filed Responsive Trial Briefs on September 1, 2023.  Dkts 88, 89, 90.

On December 13, 2023 the court held a bench trial in this case.  After evaluating the evidence at trial, including making determinations of credibility, the court issues the findings of fact and conclusions of law set forth below.

## II.   FINDINGS OF FACT

### A.  The DGA Producers' Health Plan

1.  The Directors' Guild of America—Producers health plan, sponsored by the Director's Guild of America, guarantees coverage for medically necessary

treatment and services. DGA 4423-4424.[1] The Plan covers "Mental Health & Substance Abuse" services, including residential treatment.  DGA 4368.

2. Under the Plan, a treatment, service or supply is "Medically Necessary" when it is:

> • Consistent with generally accepted medical practice within the medical community for the diagnosis or direct care of symptoms, sickness or injury of the patient, or for routine screening examination under wellness benefits, where and at the time the treatment, service or supply is rendered (the determination of "generally accepted medical practice" is the prerogative of the Health Plan through consultation with appropriate authoritative medical, surgical, or dental practitioners);
> • Ordered by the attending licensed physician . . . and not solely for the convenience of the participant, his or her physician, Hospital or other care health provider;
> • Consistent with professionally recognized standards of care in the medical community with respect to quality, frequency and duration; and
> • The most appropriate and cost-efficient treatment, service or supply that can be safely provided, at the most cost-efficient and medically appropriate site and level of service.

DGA 4423-4424.

3. The Plan provides that "Claims must be made in writing and submitted to the appropriate office which depends on the type of claim as further described below."  DGA 4396.  The Plan further states that "[c]ertain claims such as medical, prescription, dental or vision benefits must be submitted to the applicable third-party claim administrator for the Health Plan.   This means that when parties covered by the plan have prescription/pre-authorization denied by Express Scripts, the Health Plan's prescription vendor, this allows Express Scripts to perform the first level and second level appeal.  If both appeals are denied by … you can then submit an appeal to the Health Plan for further consideration."  *Id.*

---

[1] Numerical citations refer to the claim files of the Plan (prefix "DGA") and Anthem (prefix ANTHEM_DANC), which Defendants lodged with the court on March 23 and 24, 2023, at Dkts. 76 and 77, respectively.

4. The Plan requires that any adverse benefit decision will include "the specific reason or reasons for the adverse determination, reference to the health plan provisions on which the determination is based, and a description of any additional material or information necessary to perfect the claim and why the information is necessary."  DGA 4398.

5. If "an internal rule or guideline was applied in making the determination, a statement of the rule or guideline will be provided free of charge upon request," and "if the determination is based on a medical necessity determination. . . a statement that the scientific or clinical judgment applied to make the determination will be provided free of charge upon request."  DGA 4399.

6. The Plan provides an appeal process, which permits the participant to submit additional records and information related to the claim, and "the appeals decision will not afford deference to the initial adverse determination . . . ."  DGA 4400.

7..  The initial determination, as well as the first level appeal for health care claims involving residential treatment such as R.C.'s claim, are handled by Anthem, the Health Plan's third-party claims administrator. DGA 4399.

8. After the initial appeal, the Plan provides for a second level appeal which will be reviewed by the Benefits Committee of the Board of Trustees.  DGA 4400.

9. The Plan provides that "[d]ecisions shall be made in accordance with the governing Health Plan documents and, where appropriate, Health Plan provisions will be applied consistently with respect to similarly situated Claimants in similar circumstances."  DGA 4400.

10. The Plan states that one entity, the Board of Trustees, shall have sole, complete and absolute discretionary authority to decide claims. DGA 4396-7.

11. The Plan further states that

"The Benefits Committee shall have the following authority and responsibilities:

…

    c. Approving benefits awards, and hearing and determining claims appeals."
DGA 4274.

**B. R.C.'s Mental and Behavioral Health Treatment History**

12. R.C. was born in Port-au-Prince, Haiti. DGA 81; 95; 500.

13. His mother died when he was one month old. DGA 81; 95; 500.

14. His father and family were unable to care for him. Id.

15. R.C. was placed in an orphanage, DGA 29.

16. While at the Haiti orphanage R.C. where he suffered from malnutrition. Id.

17. At the age of three, Dan C. and J.C. adopted R.C.  DGA 82.

18. By the age of five, R.C displayed and behavioral health problems

19. At that time R.C. began attending outpatient therapy,

20. Since then R.C. has subsequently been in nearly every form of outpatient therapy.

21. R.C.'s diagnoses include (1) reactive attachment disorder, (2) developmental trauma, (3) disruptive mood dysregulation disorder, (4) generalized anxiety disorder, and (5) ADHD. DGA 82; 472; 680.

22. R.C. has a history of violent and destructive behavior that began in pre-school. He frequently ran out of class and threw objects at peers. DGA 82; 673.

23. On one occasion he punched his sister and drew blood. DGA 82.

24.  On another occasion, R.C. crawled to the top of a play structure, refused to come down and said he wished his teacher's children dead. DGA 83.

25. While living at home, and prior to his admission into residential treatment, R.C. had been violent to his family members, he attacked them physically, and he tried to hurt them by destroying objects they valued. Id.

///

///

26. R.C.'s behavioral health incidents and acts of violence continued during the COVID-19 pandemic, when his cycles of anger, destruction, and violence escalated.

27. R.C. was ultimately determined to be unable to remain in school.

## C. R.C.'s Treatment at and Removal from Sandhill Residential Treatment Center

28. On July 1, 2020, at the recommendation of all of his treatment providers, R.C. was admitted to Sandhill Center Residential Treatment Program ("Sandhill"). DGA 87; 680.

29. At the time of his admission to Sandhill, R.C. was nine years old. DGA 86-87.

30. Sandhill is an inpatient residential treatment facility that offers a sub-acute level of treatment and care for adolescents with mental and behavioral health problems.

31. After three weeks Sandhill realized their facility was not equipped to deal with the severity of R.C.'s condition. DGA 680.

32. While at Sandhill, the nine-year old R.C. was discovered having oral sex with one of his male roommates. DGA 94-95; 680; 2162.

33. The specific treatment notes states that RC. was caught with another boy "touching each other's private parts and sucking on them."

34. Sandhill reported that R.C. had quickly discovered a way to engage in these sex acts outside the view of the security cameras. *Id.* 32. Sandhill told Dan C. that R.C. needed to leave the facility immediately. *Id.*

35. At the time of R.C.'s discharge, the clinical director of Sandhill stated R.C. "continued to need [] a residential care level of services." DGA 680.

36. Sandhill's clinical director strongly recommended that R.C. continue residential treatment on discharge at a facility with single rooms better able to meet his needs. DGA 680.

///

### D. R.C.'s Residential Treatment at Intermountain

37.    On August 4, 2020 R.C. was admitted to Intermountain.

38.    Intermountain is an inpatient residential treatment facility that also offers sub-acute mental and behavioral health treatment and care.

39.    R.C.'s lack of impulse control and sexualized behavior continued during his treatment at Intermountain. DGA 95.

40.    Intermountain's intake assessment noted R.C.'s current risk factors as "sexual reactive behaviors" along with other current and historical risk factors including "increasing agitation, increasing anxiety, loss of important person, significant worsening of family functioning." DGA 2163; 96.

41.    Intermountain records showed daily problems and a prior inability to function at home that had lasted 12 months. DGA 2164-5; 96.

42.    On 8/20/2020, R.C. attempted to sneak out of his room and into a peer's room. DGA 101; 2245.

43.    On 9/29/2020, R.C. threatened to "kill everyone in the cottage" and said that another patient, "made that noise and I am going to stab him in the heart with a knife." DGA 116; 2318.

44.    On 11/24/2020, R.C. punched a staff member in the stomach.  DGA 1191.

45.    During the altercation, R.C. "told in detail how he was going to kill his cottage peers and their families. He described disemboweling them and sneaking into their rooms at night to kill them. He told them he knows where they all live and he will kill everyone in their family."  Id.

46.    On 2/12/2021 R.C. again threatened to disembowel his peers, and claimed he was "Messiah" and was hearing "God within his head." DGA 3769.

47.    The Intermountain treatment notes include over a dozen incident reports of physical attacks on staff, sexual aggression toward peers and staff, and examples of R.C.'s general inability to care for himself.  DGA 95; 101; 116; 820-24; 827; 1191-2; 1371; 1477; 1615; 1672; 1864; 2245; 2318; 3769-70.

48.    R.C. was ultimately discharged from Intermountain on September 30, 2021.

### E.  Anthem's Denial of R.C.'s Residential Treatment at Intermountain

49.    Anthem initially approved R.C.'s admission and treatment at Intermountain as being medically necessary. After three days, however, Anthem re-evaluated its coverage decision. DGA 11-14.

50.     After the initial three-day period, Anthem denied all of R.C.'s claims for treatment and care at Intermountain.

51.    Anthem based its denial on internal proprietary medical necessity criteria called the MCG Guidelines, outlined above.  DGA 25-28; ANTHEM_DANC 2269-70.

52.    An Anthem case manager stated that medical necessity was not met because there was no evidence of "danger to self for child."  Id.

53.    Anthem's case manager cited Anthem's previous decision of denial of R.C.'s treatment at RTC, Sandhill, as of 7/21/20, on the basis that residential treatment was no longer necessary, and he could be treated at a lower level of care, such as partial hospitalization or intensive outpatient treatment.  Id.

54.    This statement conflicted with the discharge notes from the medical professionals at Sandhill who were treating R.C. and who determined that Sandhill did not offer a *high enough* level of care to meet his needs, as they were unable to prevent him from engaging in sexual activity with his roommate.

55.    Anthem's reviewer acknowledged that R.C. "was at last RTC and had to leave due to sexually acting out," but nevertheless upheld Anthem's previous decision to deny ongoing residential treatment at the facility remained valid, and stated that this precedent should be extended to his claim for treatment at Intermountain.  Id.

56.    Anthem's physician reviewer, Dr. Joshua Nelson, wrote "agree with CM [case manager] rationale and assessment," and quoted the case manager's case note highlighting Anthem's previous denial of R.C.'s residential treatment at Sandhill on 7/21/20.  ANTHEM_DANC 2270.

57.    The specific guidelines the Anthem case manager and Dr. Nelson used were the MCG guidelines 24th edition, Residential Behavioral Health Level of Care, Child, or Adolescent (ORG: B-902-RES). DGA 207-218.

58.    Under the MCG Guidelines, admission of a child or adolescent to the residential behavioral level of care is medically necessary when all of the following are met:

A. Patient risk or severity of behavioral health disorder is appropriate to proposed level of care as indicated by **one** or more of the following:

- Danger to self or others
- Behavioral health disorder is present and appropriate for residential care with all of the following:
  - Moderately severe psychiatric, behavioral, or other comorbid conditions
  - Serious dysfunction in daily living

1. Treatment services available at proposed level of care are necessary to meet patient's needs and one or more of the following:
   - Specific condition related to admission diagnosis is present and judged likely to further improve at proposed level of care.
   - Specific condition related to admission diagnosis is present and judged likely to deteriorate in absence of treatment at proposed level of care.
   - Patient is receiving continuing care …

2. Situation and expectations are appropriate for residential care as indicated by all of the following:
   - Recommended treatment is necessary, appropriate, and not feasible at lower level of care …

- Very short-term crisis or intervention and resource planning for further care at nonresidential level is unavailable or inappropriate.
- Patient is willing to participate in treatment within highly structured setting voluntarily.
- There is no anticipated need for physical restraint, seclusion, or other involuntary control.
- Medical or nursing care services to address primary admission diagnosis are available as indicated by ONE or more of the following:

. . .

- Active (but-not-around-the-clock) monitoring of patient by staff needed, and medical care or nursing care can easily be provided if need arises (i.e., comorbid medical, psychiatric, or behavioral conditions have potential to distract from treatment).

. . .

- Patient has sufficient ability to respond as planned to individual and group therapeutic interventions.
- biopsychosocial stressors . . . absent or manageable at proposed [LOC]

ANTHEM_DANC 000276.

59.     The denial letter Anthem sent to Plaintiff on 8/7/20 states in relevant part that:

> The plan clinical criteria considers ongoing residential treatment medically necessary for those who are a danger to themselves or others (as shown by hearing voices telling them to harm themselves or others or persistent thoughts of harm that cannot be managed at a lower level of care). **This service can also be medically necessary**

> **for those who have a mental health condition that is causing serious problems with functioning.** (For example, being impulsive or abusive, very poor self care, not sleeping or eating, avoidance of personal interactions, or unable to perform usual obligations) . . . **The information we have does not show you are a danger to yourself or others**. For this reason, the request is denied as not medically necessary." DGA 188; ANTHEM_DANC 257 (emphasis added).

### F. Plaintiff's Appeal

60.   On February 18, 2021 Plaintiff submitted an appeal.  This appeal was over 2,000 pages long and included five separate letters of medical necessity from R.C.'s treating providers, as well as hundreds of pages of medical records documenting R.C.'s symptoms.  DGA 70-181, et seq.

#### 1.   Head of R.C.'s School

The Head of School at R.C.'s primary school wrote a letter documenting the intractable struggles R.C. faced prior to residential treatment, and his need for ongoing care because R.C. was unable to regulate his behavior and emotional responses, did not understand how to react appropriately, and "requires continued therapeutic treatment to assist him in identifying his emotions and to acquire the necessary tools to navigate successfully in the world the surrounds him.  DGA 671.

#### 2.   Bonnie Mark Goldstein, LCSW, PhD

Dr. Goldstein was R.C.'s individual and family therapist for over a year before he entered residential treatment.  Dr. Goldstein wrote of her "extreme concern about his [R.C.'s] wellbeing" and that while she

> initially thought that [R.C.'S] challenges could be addressed during our weekly sessions in outpatient treatment, I came to recognize that his challenges are more global.  **Each area of his life is affected**;  . . .
>
> I quickly determined that t**he level of care the family could provide would not be sufficient to protect family members.** … Given the persistence of his symptoms over the years, with increasing severity, **a residential level of care is necessary to achieve significant and lasting improvement.**" DGA 673.  (emphasis added)

#### 3.   Alexis D. Naim, LCSW

Alexis Naim was R.C.'s family therapist.  Ms. Naim wrote that "…over the course of several years working with his [R.C.] parents and having also met with his siter [omit], it has been markedly evident that [R.C.]'S behavioral challenges and emotional difficulties became impossible to safely manage at home with outpatient treatment."  She explained that R.C.'s "…episodes of violence and reactivity at home increased and it became clear that residential treatment was mandatory."  DGA 675.

### 4.   Kristen J. Naspo, M.A.

Kristen Naspo is an educational consultant who in her professional opinion concurred that R.C.s placement for residential treatment at Intermountain is "where he needs to be and lend my support for this placement as is," and "when students have the history that [R.C.] has, this isn't something that is a quick fix."  DGA 677-678.

### 5.   Kurt Wulfekuhler, Ph.D., LPCC

Dr. Kurt Wulfekuhler is the clinical director at Sandhill Child Development Center. Dr. Wulfekuhler also strongly recommended continued residential treatment for R.C., after he had to be discharged from the program at Sandhill due to "sexually inappropriate behavior," including "touching each other's private parts and sucking on them."  DGA 680. Dr. Wulfekuhler added:

> "It was our strong recommendation at the time of discharge that [R.C.] continued to need the services of a residential care level of services, specifically with an RTC that provided a single room." *Id.*

61.   Plaintiff's appeal to Anthem also included treatment notes from R.C.'s residential treatment center, Intermountain.

62.   Those notes documented R.C.'s history of difficulty functioning at home and at school for at least 12 months prior to his admission DGA 2164-5; 96.

63.   The notes further documented R.C.'s history of inappropriate sexual behavior, and his continued problems with sexualized behavior at Intermountain, including sneaking out of his room at night and into a peer's room DGA 101; 2245.

64.   The notes further documented R.C.'s history and ongoing incidents involving anger and violence, including hitting a staff member on 9/4/2020 (DGA

1864; 107), threatening to hit two peers on 9/25/2020, pushing a table at adults and picking up a stool while posturing as if he was going to hit another individual on 9/25/2020. DGA 1672; 114.

65.    On 9/29/2020, while in treatment at Intermountain, R.C. said that he was going to "kill everyone in the cottage" and that he would "stab them with a knife, including whoever made that noise." DGA 116; 2318.

66.    He then specifically threatened to stab the individual who made the noise in the heart with a knife. *Id.*

### G. Anthem's Appeal Denial

67.    Anthem denied Plaintiff's appeal. ANTEHM_DANC 2260.

68.    Anthem's denial stated that "after the treatment you had, you were no longer at risk for serious harm that needed 24 hour care." DGA 2414. "You could have been treated with outpatient services". *Id.*   "We based this decision on the MCG guideline Residential Behavioral Health Level of Care, Child and Adolescent (ORG: B-902-RES)." *Id.*

69.    Anthem's denial did not address any of R.C.'s medical providers' letters or recommendations submitted with Plaintiff's appeal, nor any of the thousands of pages of medical records that were included in the appeal.

### H. MRI's Denial of R.C.'s Second Level Appeal

70.    Plaintiff requested the Plan reconsider Anthem's denial and submitted a second level appeal to the Plan. DGA 2354-2407, et seq.

71.    The Plan did not review Plaintiff's appeals. Instead, it submitted Plaintiff's second-level appeal to a third-party reviewer, Medical Review Institute of America ("MRI").  DGA 2332.

72.    MRI submitted two reports, dated 6/15/20 and 7/11/20, denying Plaintiff's appeals. *Id.*

73.    MRI's first report echoed Anthem's denial:

> By the DOS 08/07/20 **there was no ongoing evidence of persistent risk of harm to self or others**, no significant aggression or threatening behavior, and no evidence of serious impairment of daily functioning. The patient is noted to require frequent redirection, but this level of service does not require 24 hour a day monitoring and support. In addition, there is no evidence of severity of depression or mania, as well as no evidence of a thought disorder that would require residential services . . . Therefore, there is no medical necessity for continued RTC LOC . . .

DGA 2332.

74.    The MRI report did not reference any of the medical evidence contained in Plaintiff's appeal and contained no analysis. *Id.* The same is true with the later MRI report, which added little and insufficient analysis. DGA 4215.

## I.    The Board of Trustees' Benefits Committee's Adoption of MRI's Denial Without Further Review or Application of Medical Necessity Standards

75.    The MRI report was submitted to the Benefits Committee.

76.    It is does not appear from the record that the Plan's medical director or its Benefits Committee (whom the Plan contends makes benefits determinations) read or reviewed any of the medical records or appeals underlying the MRI report.

77.    The Plan provided no documents in the administrative record that showed the Plan contributed any analysis to Plaintiff's claims beyond MRI's cursory reports.

78.    The Plan concedes that no member of its Benefits Committee is trained in mental health. Lilienstein Decl. ¶ 10, Exh. B to Dkt. 81-3.

## J.    The Plan's Relationship With MRI

79.    In litigation, the Plan conceded that none of the members of the Benefits Committee have any training in mental health. The Plan does not disclose to members, and did not disclose to Plaintiff or R.C. that that "Mental health claims are not within the Plan's chief medical advisor, Dr. Steven M. Simons's, purview and specialty," and that, for mental health care claims, the Plan's chief medical advisor and Benefits Board Committee "defer[] to the medical opinions expressed by the specialty of the medical

PLAINTIFF'S [PROPOSED] FINDINGS OF FACT AND LAW          Case No. 2:22-cv-03647-FLA-AFM

reviews of Anthem and MRI" in appeal determinations, thereby rendering the appeals process outlined in the Plan illusory. Lilienstein Dec. ¶ 8-9, Exhibit B.

80.    The Plan routinely uses MRI to decide appeals of mental health denials, and did so herein.

81.    The MRI report conclusion was to uphold the Anthem denial.

82.    The Plan's medical director recommended that the Benefits Committee adopt the MRI report, and the Benefits Committee did adopt the MRI report conclusion(s).

83.    While the final decision in this, and all Plan claims, is actually made by MRI, rather than the Benefits Committee, this fact is not disclosed to participants.

84.    The Plan document does not identify third-party MRI as the ultimate decision-maker of benefit determinations.

85.    During the two-year period preceding the MRI and Benefits Committee denials of R.C.'s claims for residential treatment, MRI had reviewed seventeen Anthem denials of residential treatment claims. See Exh. B, p. 8, ll. 26-27.

86.    There was not one instance when MRI overturned an Anthem denial of a claim for residential treatment and care. Id. at p. 12, ll. 1-3.

87.    Similarly, during this same time period, there was not one instance when the Benefits Committee's medical director failed to adopt an MRI uphold of an Anthem residential treatment denial. To the contrary, in every instance the Plan's chief medical advisor deferred to either the MRI or the Anthem denial, or both. Id. at p. 14, ll. 13-15.

88.    During this time period the Benefits Committee never departed from its medical director's recommendations, meaning the Benefits Committee always adopted the conclusion of MRI. See, e.g. , id. at p. 16, ll.15-17

89.    The Plan does not disclose that "[t]he Plan is unaware of a time in which MRI's review of Anthem's claim denial involving care at a residential treatment center claim for members or subscribers of the Plan resulted in a complete overturn of the underlying denial from 2019 to 2021." Lilienstein Dec. ¶ 7, Exhibit B.

### III.   CONCLUSIONS OF LAW

#### A.  Rule 52(a)

In the Ninth Circuit, actions to recover benefits under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA"), are adjudicated by bench trial under Fed. R. Civ. P. 52(a) ("Rule 52(a)"). *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094-95 (9th Cir. 1999). Under Rule 52(a), the court can resolve factual issues in favor of either party, and must "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)

#### B.  The Standard of Review is *De Novo*

1.   A denial of ERISA benefits challenged under 29 U.S.C. § 1132 "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).   Any grant of discretionary authority must be clear and unambiguous. See *Abatie v. Aetna Health & Life Ins Co.,* 458 F.3d 955, 963 (9th Cir. 2006).

2.   Under the abuse of discretion standard, "[a] plan administrator abuses its discretion if it renders a decision without any explanation, construes provisions of the plan in a way that conflicts with the plain language of the plan, or fails to develop facts necessary to its determination."  *Anderson v. Suburban Teamsters of N. Ill. Pension Fund Bd. Of Trustees*, 588 F.3d 641 at 649 (9th Cir. 2009).

3.   The parties have already briefed the standard of review issue, and the court has already determined that the standard of review in this action shall be de novo. Dkt. No 92.

4.   As the court has previously noted, "it is undisputed that the Benefits Committee denied Plaintiff's appeal of Anthem's eligibility determination." and there was insufficient evidence "of a resolution or other writing explicitly

conferring the Benefits Committee with the authority to make final decisions on behalf of the Trustees on denial of claims appeals." Dkt. No. 92, p. 10, ll. 4-17.

5.      The court, therefore, reviews Plaintiff's claims under a de novo standard and "evaluate[s] whether the plan administrator correctly or incorrectly denied benefits, without reference to whether the administrator operated under a conflict of interest." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).

6.      Ultimately, regardless of the standard of review, "[w]hat a district court is doing in an ERISA benefits denial case is making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical records." *Id.* at 969.

**C.      R.C. Was Entitled to Benefits Under Any Standard of Review Because His Treatment was Medically Necessary and the Denial Was Unreasonable**

7.      Based on the medical records, R.C.'s mental and behavioral health history prior to his residential treatment, the conduct of Defendants during the administrative review process, ERISA's claims handling requirements, and on the administrative record provided to the court, Plaintiff has demonstrated that he is entitled to residential treatment benefits pursuant to the terms of the Plan under any standard of review.

**D.      Defendants Improperly Applied Acute-Level Guidelines for A Sub-Acute Level of Care**

8.      The Plan covers residential treatment as long as it is "medically necessary," which is defined as:

- Consistent with generally accepted medical practice within the medical community for the diagnosis or direct care of symptoms, sickness or injury of the patient, or for routine screening examination under wellness benefits, where and at the time the treatment, service or supply is rendered (the determination of "generally accepted medical practice" is the prerogative of the Health Plan through consultation with

16

appropriate authoritative medical, surgical, or dental practitioners);

- Ordered by the attending licensed physician . . . and not solely for the convenience of the participant, his or her physician, Hospital or other care health provider;

- Consistent with professionally recognized standards of care in the medical community with respect to quality, frequency and duration; and

- The most appropriate and cost-efficient treatment, service or supply that can be safely provided, at the most cost-efficient and medically appropriate site and level of service.

DGA 4423-4424.

9.    The Plan's denial of R.C.'s residential treatment was based on the medical reviews performed first by Anthem and then by MRI.  Those reviews, in turn, were based on the MCG Behavioral Health Criteria, specifically the criteria entitled *Residential Behavioral Health Level of Care, Child or Adolescent (B-902-RES)* (hereinafter the "MCG").

10.   Anthem's first level medical reviewer determined that R.C.'s residential treatment was not medically necessary because he was not suicidal, homicidal, or psychotic, was medically stable, and did not need 24-hour care. ANTHEM 2270.

11.   MRI's first review on behalf of the Plan denied R.C.'s treatment because there was "no ongoing evidence of persistent risk of harm to self or others . . ."  DGA 2332.

12.   Each of the reviewers that denied R.C.'s claims and appeals relied on the MCG, and, fundamentally, on what were characterized as R.C.'s purported lack of imminent, serious, or persistent risk of harm to himself or others. Defendants did not appear to utilize the Plan definition of medical necessity.

13.   The MCG Guidelines have been found to violate generally accepted standards of care in the medical community by, *inter alia*, (1) overemphasizing acuity over treatment of the underlying condition, (2) failing to address the

effective treatment of co-occurring conditions, (3) failing to err on the side of caution in favor of a higher level of care when there is ambiguity. *Smith on Behalf of Smith v. Health Care Serv. Corp.*, 2021 WL 963814 at *2 (N.D. Ill. Mar. 15, 2021).  *See also  H.N. v. Regence BlueShield,* Case No. 15-cv-1374 RAJ, 2016 WL 7426496 (W.D. Wash. Dec. 23, 2016); *Charles W. v. Regence BlueCross BlueShield of Oregon*, 2:17-CV-00824-TC, 2019 WL 4736932, (D. Utah Sept. 27, 2019), *order clarified*, 2:17-CV-00824-TC, 2020 WL 1812372 (D. Utah Apr. 9, 2020).

14.   The MCG Guidelines for residential treatment, in effect, mirror the criteria in California Welfare & Institutions Code section 5150 required to involuntarily commit an individual to an acute psychiatric facility.

15.   Section 5150 provides for an involuntary acute psychiatric hospital hold for a person who, "as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled . . ."  Cal. Welf. & Inst. § 5150(a).

16.   Many courts have examined the MCG and found that, either as written, or as applied, they do not reflect generally accepted standards of medical practice.  The "MCG [Milliman Care Guidelines] improperly focus on acute symptoms and presenting problems" and crisis stabilization, rather than "effective treatment of the patient's overall condition." *Jessica U. v. Health Service Corp.* 2020 WL 6504437 at *6 (D.Mont. Nov. 5, 2020).

17.   *Jessica U*. benefited from an older analysis, in *H.N. v. Regence BlueShield*, 2016 WL 7426496 (W.D. Wash. Dec. 23, 2016). There the court criticized the MCG as "only account[ing] for residential acute levels of treatment." *Id*. at *8. In finding for the plaintiff, the court noted that the insurer:

> places the highest value on the MCG, it provides no authority to show that these are the only guidelines by which Plaintiffs must prove their right to benefits. Indeed, Plaintiffs provided evidence by several

> physicians who can attest to the accepted
> medical standards that were met when deciding on the
> treatment options for H.N.

*Id.* at *10.  In fact, in *S.B. v. Oxford Health Ins. Inc.*, 419 F.Supp.3d 344 (D.Conn. 2019), the court called out as an abuse of discretion acuity-based guidelines for residential treatment, stating in part that if the patient "were homicidal or suicidal, inpatient hospitalization, and not residential treatment" would be appropriate. 419 F.Supp. 3d at p. 365.

18.   The court finds that the same issue is evident here.  The first two criteria of the MCG state that a patient must be actively suicidal or homicidal to qualify for residential treatment.

19.   *Charles W. v Regence BlueCross BlueShield of Oregon*, 2019 WL 4736932 (D.Utah, Sept. 27, 2019) is also instructive.  In *Charles W. v. Regence BlueCross of Oregon*, 2019 WL 4736932  (D.Utah Sept. 27, 2019) the plaintiff contended that "the MCG [Milliman Care Guidelines] was not actually the appropriate standard to assess [plaintiff's] fitness for discharge because the type of inpatient care addressed by the MCG is acute or emergency hospitalization, not long-term sub-acute residency programs . . ." *Charles W.*, 2019 WL at *5.

20.   The court, citing another case involving the MCG, agreed, noting that "[t]he MCG might be a helpful tool but were not intended to operate as the sole basis for denying treatment or payment. *Id*. (quoting *H.N. v. Regence Blue Shield*, 2016 WL 742496 (W.D. Wash, Dec. 23, 2016).

21.   The court cited evidence from *H.N.*, infra, that "[p]eer-reviewed scientific studies have shown that for patients with persistent behavioral disorders that have not responded to outpatient therapy, long-term non-acute RTCs provide highly effective treatment. 2019 WL 4736032 at *7, *8 (*quoting in part H.N.*, *infra*, 2016 WL 7426496 at *4).

22.   In an analogous situation, the court in *Raymond M. v. Beacon Health Options, Inc.*, stated that "BHO acted arbitrarily and capriciously in denying

benefits to Plaintiffs by applying acute-level medical necessity criteria to RTC treatment that the Plan classifies as providing subacute care." 463 F.Supp.3d 1250. *Raymond M.* is directly on point.

23.   The statement that the carrier's "application of medical necessity criteria that calls for acute-level symptoms when the Plan recognizes that RTC treatment is for subacute conditions is arbitrary and capricious" applies equally herein. *Id*.

24.   The court finds that Residential mental health treatment is, as defined by both the California and Federal Mental Health Parity Acts, an intermediate level of care.  It is not an acute level of care.

25.   Consistent with the determinations in sister courts, the court finds that the MCG criteria do not reflect the Plan's definition of covered "Medically Necessary" healthcare, defined as that which is, *inter alia*, consistent with generally accepted medical practice.  The MCG criteria do not reflect generally accepted standards of medical practice, because they apply acute treatment criteria to a subacute level of care: residential treatment.

26.   The court finds that the MCG set forth onerous criteria that make it all but impossible to qualify for coverage of residential mental health treatment.

27.   Based upon all of these factors, the Court concludes the MCG should not have been applied in this case and that in light of the entire administrative record, Plaintiff has demonstrated by a preponderance of the evidence that R.C.'s residential treatment at Intermountain was medically necessary

**E.    R.C. Satisfied the MCG Guidelines for Residential Treatment**

28.   In addition to the general failings of the MCG Criteria, here, the Plan and its reviewers did not apply the MCG criteria accurately, and based their conclusions on obvious mistakes of fact regarding R.C.'s history, symptoms, and treatment.

29.   For example, in response to Plaintiff's second level appeal to the Plan, MRI submitted two terse reports, dated 6/15/20 and 7/11/20, denying both of Plaintiff's appeals.  MRI's first report contends, *inter alia*, that "there was no **ongoing evidence** of **persistent risk of harm to self or others**, no **significant aggression** or **threatening behavior**, and no evidence of serious impairment of daily functioning." DGA 2332-3. (emphasis added).

30.   This rationale lacks reference to any of the medical evidence provided with Plaintiff's appeals and contains virtually no analysis.

31.   The same is true with the later MRI report, which states that R.C.'s behavior is only intermittently problematic. DGA 4215. This ignores the numerous instances of self-harm and harm to others throughout the Intermountain treatment records.

32.   Had the Plan considered the MCG criteria in their entirety, R.C.'s claims should have been approved.

33.   For example, the MCG guidelines define "Danger to self for child or adolescent" as being present when there is "indication or report of significant physical or sexual risky behavior with impaired impulse control, judgment, or insight that significantly endangers self." ANTHEM 280.

34.   Residential treatment is indicated under the MCG when the patient is *either* a danger to himself or others *or* has moderately severe psychiatric disorders or comorbid conditions or has serious dysfunction in daily living.

35.   R.C. met both criteria.  His diagnoses remained unchanged for the duration of treatment, and *every* treatment provider recommended that his condition would improve with further treatment and would deteriorate in the absence of treatment.

36.   Treatment is also indicated when progress is being made. Treatment notes reflect an anticipated achievement by February 2022 (DGA 984).

37.   The MCG Guidelines also indicate residential treatment when the patient's diagnosis at admission does not change and is likely to improve at the proposed level of care, or their conditions are likely to deteriorate in the absence of treatment at the proposed level of care.

38.   The administrative record contains evidence that R.C.'s impulse control was so low that he had engaged in repeated sex acts at his previous facility, and he continued to engage in unwanted sexual behavior at Intermountain—with over a dozen episodes documented in the treatment notes. DGA 000988.

39.   The MCG guidelines define "Danger to others for child or adolescent" as being present when there is "moderately severe to severely impaired impulse control, judgment, or insight . . ." *or* "indication or report of significant physica9l or sexual aggression with impaired impulse control, judgement, or insight that significant endangers another," *or* "current homicidal ideation with either clearly expressed intentions or past history of carrying out such behavior." ANTHEM 280.

40.   R.C.'s repeated episodes of impulsive and abusive activity included headbutting and kicking staff, threatening staff with homemade weapons, and threatening peers with murder. DGA 003769.

41.   Intermountain staff noted that these episodes required nine physical interventions requiring them to forcibly restrain R.C. DGA 000827; 3769; 3770; DGA 1477; 1191; 1192.

42.   R.C. punched a staff member in the stomach. DGA 001191-92. When he was restrained, R.C. continued to kick, headbutt, scratch, and spit on staff. Id.

43.   While being restrained, R.C. was able to break one arm free and punch a staff member in the back. Id.

44.   R.C. "told in detail how he was going to kill his cottage peers and their families." Id.

45.   The MCG guidelines also include "auditory hallucinations or paranoid delusions contributing to risk of [homicide or suicide] or serious harm to [another

or self]" as indicative or danger to self or others for children or adolescents. ANTHEM 280.

46.   R.C. claimed that he was "Messiah" and was hearing "God within his head." DGA 1191-92.

47.   The court finds that R.C. met all the MCG criteria for continued treatment at Intermountain. His risk of harm to himself was well documented. (DGA 984-989). He was violent to staff members (DGA 107), and peers (DGA 114), threatening to "stab them with a knife" (DGA 116).  R.C.'s multiple co-morbid conditions were well documented (DGA 460-87).

48.   R.C.'s dysfunction in daily living was evidenced from (1) his years of failed outpatient therapy, (2) getting kicked out of prior treatment due to oral sex acts (DGA 96), (3) an inability to maintain personal hygiene (DGA 988), (4) sneaking out and into a peer's room at night (DGA 101).

49.   The court finds that the Plan's reviewers were only too keen to jump on R.C.'s apparent lack of suicidality, while ignoring that on multiple occasions R.C. was threatening harm to any people that frustrated or angered him.

50.   The court finds that no analysis or credit was given to the fact that R.C.'s treaters put him on multiple holds, these paper reviewers concluded that the volume of holds was not enough to approve ongoing treatment. Similarly, the existence of aggression was not enough, suddenly there was a requirement of significant aggression.

51.   The court fails to find any substantive discussion from the Plan or its reviewers that R.C.'s condition was so extreme that his previous residential treatment center could not effectively treat him. This nine-year old boy was sexually assaulting others, but the reviewers somehow chose not to incorporate this ongoing, inconvenient fact, into their analysis.

52.   R.C. was also willing to participate in treatment. DGA 984-986.

53.   All of the above facts warrant approval under the guidelines.

### F. The Plan failed to Account for or Reconcile Its Conclusions with Probative Evidence of Medical Necessity from Multiple Medical Professionals Who Treated and or Examined R.C.

54.   The plaintiff's son R.C. needed a higher—not a lower—level of residential treatment care and oversight, and his sexual misconduct was so dramatic that Sandhill's Dr. Wulfekuhler expressly urged that R.C. needed his own room. DGA 680

55.   Dr. Wulfehuhler was only one of many mental health professionals who explained why R.C. needed to continue with in-patient residential treatment.

56.   Defendants admitted the fact of R.C.'s treatment at Sandhill but ascribed no weight to it, failed to account for Dr. Wulfekuhler's recommendation, and concluded R.C. should go home and be treated on an outpatient basis. Nowhere is there a discussion of why R.C. needed to leave Sandhill, and how this supported the conclusion that it was safe to send R.C. home.

57.    The court also notes the unanimity with which R.C.'s treaters, medical professionals, and consultants recommended ongoing inpatient 24/7 residential treatment. This went as far back as the head of R.C.'s primary school, who stated in no uncertain terms that R.C. was incapable of functioning in school and needed such treatment to live in and contribute to society. DGA 671.

58.   Nowhere did the Plan reconcile the headmaster's comments with their own conclusion that R.C. could return to—and succeed at—school, or Dr. Goldstein, who was unequivocal that R.C.'s family could not be protected if R.C. was denied an inpatient residential treatment level of care. DGA 673.

59.   Instead the Plan summarily stated that R.C. could return home, but failed to rebut the many examples provided by Plaintiff of R.C.'s violent, psychotic and potentially homicidal behavior and ideations. In addition, the court finds that the Plan failed to explain what had changed in R.C.'s behavior to ensure the safety of his family after only three days at Intermountain.

60.   These facts included the "increasing severity" of R.C.'s behavior while in an outpatient setting. Not one of Defendants' legion of reviewers addressed this. Nor did they explain how Mr. Naim, Plaintiff's family's therapist, erred when he stated that safety was also a concern for Plaintiff's family and that "residential treatment was mandatory."  DGA 668.

61.   Neither the Plan nor MRI attempted to explain why R.C.'s numerous instances of risk of harm, aggression, and impairments in activities of daily living in the record should be disregarded.

62.   R.C.'s treating providers also warned of the potential dire outcomes and of the "extreme concern" were R.C. to return home, to the point where family members' physical well-being could be at risk. DGA 673. Defendants failed to reconcile their denial rationale with these outcome risks, and, had their recommendations been followed and R.C. discharged home, would have improperly exposed R.C.'s family to physical danger.

63.   The Ninth Circuit has repeatedly affirmed that a plan administrator may not simply ignore evidence and dismiss the conclusions of a beneficiary's treaters without explanation. *Booton v. Lockheed Medical Benefit Plan,* 110 F.3d 1461, 1463 (9th Cir.1997); *Saffon v. Wells Fargo & Co. Long Term Disability Plan,* 522 F.3d 863, 870 (9th Cir. 2008); *Salomaa v. Honda Long Term Disability Plan,* 642 F.3d 666, 679 (9th Cir. 2011)("Weighty evidence may ultimately be unpersuasive, but it cannot be ignored")

64.   Defendants proffer the quantity over quality argument ("look at how many people reviewed R.C.'s claim," they repeat), but such a "choice raises questions about the thoroughness and accuracy of the benefits determination." *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 634 (9th Cir. 2009) (internal quotations and citations omitted).

65.   Moreover, as the Ninth Circuit has stated in the years following *Montour*, this "any reasonable basis" language does not mean that courts may

make determinations "without looking at all the circumstances of the case." *Pacific Shores,* 764 F.3d at 1042.  (overturning administrator's denial where reviewers made factual errors, and decisions were "rubber-stamped" on appeal).

66.   The court finds that the Plan's analysis is unreasonably cursory and superficial.

67.   The court's conclusions are buttressed by evidence produced in discovery concerning the relationship between The Plan and MRI, and MRI's track record with other appeals of Anthem residential treatment claim denials.

68.   MRI has never overturned an Anthem denial through the Plan. See Lilienstein Decl., Dkt. 86-1, ¶ 7. This is clear evidence of bias. *See Caplan v. CNA Fin. Corp.*, 544 F. Supp. 2d 984, 991-92 (N.D. Cal. 2008) (finding that statistics showing that a reviewing physician found that 14 out of 14 claimants were capable of performing work "strongly suggests that both [the medical review organization] and [the physician] harbored a significant bias toward finding a claimant capable of performing some type of work.")

69.   To the extent that Defendants waited until this litigation to question the probative value of the medical opinions of those treaters familiar with R.C., and who either treated, examined or observed R.C., such litigation tactics were rejected by the Ninth Circuit more than a decade ago in *Harlick v. Blue Shield of California*, 686 F.3d 699, 719-720 (9th Cir. 2012) (noting that plan administrators are "not allow[ed] . . .  to assert a reason for denial of benefits that it had not given during the administrative process.")

70.   This tactic also reflected the Plan's failure to afford Plaintiff a full and fair review of his various appeals.  If Defendants had a problem with every single one of Plaintiff's proffered letters of medical necessity, they should have told Plaintiff that during the claims process and allowed Plaintiff to address the issue.

71.   The Plan contends that its decision was supported by "two qualified medical expert reports performed by a qualified and independent physician, in addition to the two expert reviews performed by Anthem's reviewing physicians."

72.   But these "expert reports" and "expert reviews" were *pro forma*, conclusory, and failed to engage with any of the voluminous medical evidence or treating providers' letters that showed R.C.'s treatment was medically necessary. *See Dominic W. on behalf of Sofia W. v. N. Tr. Co. Emp. Welf. Ben. Plan* , 392 F.Supp.3d  907, 917 (N.D. Ill. 2019) ("[a]lthough an administrator is not prohibited from crediting the opinion of a physician who conducted only a file review, relying on a file review that is contrary to treating doctors' opinions that have substantial medical support may be arbitrary and capricious." and "[t]his is particularly true in cases involving psychiatric diagnoses and assessments of risk."); *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463-4 (9th Cir. 1997); *Backman v. Unum Life Ins. Co. of Am.*, No. 14-CV-05433-YGR, 2016 WL 3180016, at *11 (N.D. Cal. June 8, 2016) ("While ERISA does not accord special deference to the opinions of a treating physician, courts generally give greater weight to doctors who have actually examined the claimant versus those who only review the file, especially when they are employed by the insurer as here.")

73.   These experts never once spoke with R.C., his parents, or the providers who submitted letters outlining their recommendation for residential treatment, and are contradicted many times over by the evidence in the record.

74.   The Plan erred by adopting MRI's conclusory statement that "there was no ongoing evidence of persistent risk of harm to self or others, no significant aggression or threatening behavior, and no evidence of serious impairment of daily functioning."

//

//

///

### G. The Plan Failed to Fairly Engage With the Medical Opinions and Evidence From R.C.'s Treating Professionals

75.   The Plan's denials of R.C.'s residential treatment at Intermountain did not take into account the medical opinion letters submitted by R.C.'s treating providers, as well as the voluminous treatment notes included in R.C.'s appeal.

76.   While an administrator under ERISA is not required to *defer* to the opinions of a treating physician, it "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834.

77.   While the Court is not required to give any particular weight to the opinions of medical professionals who treated or personally evaluated the claimant, they cannot "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Andrew C. v. Oracle Am. Inc. Flexible Benefit Plan*, 474 F. Supp. 3d 1066, 1083 (N.D. Cal. 2020) *citing Nord, supra*.

78.   A plan administrator must engage with the medical opinions provided by its claimant's treating providers.

79.   The Ninth Circuit has repeatedly held that failing to consult the claimant's treating physician is an "inadequate investigation [that does] not provide a reasonable basis for making a determination" to which a Court must defer. *Booton*, 110 F.3d 1461 at 1463-4 .

80.   In *Salomaa*, 642 F.3d 666 at 967-68, the Ninth Circuit found that the plan abused its discretion where:

> Its decision was illogical, implausible, and without support in inferences that could reasonably be drawn from facts in the record because (1) every doctor who personally examined [the claimant] concluded that he was disabled; . . . (4) the reasons for denial shifted as they were refuted, were largely unsupported by the medical file, and only the denial stayed constant; and (5) the plan administrator failed to engage in the required 'meaningful dialogue' with [the claimant].

### H.  The Plan Failed to Apply Any Medical Necessity Standards or Criteria to Its Review of R.C.'s Claim.

81.   The Plan does not claim to have used any medical necessity guidelines or criteria to evaluate Plaintiff's appeal.

82.   Instead, it admits that it simply "deferred to the medical opinions expressed by the specialty of the medical reviews of Anthem and MRI" thereby rendering the appeals process outlined in the Plan illusory. Lilienstein Dec. ¶ 8-9, Exhibit B.

83.   Anthem and MRI claim to have used the MCG Guidelines (DGA 25-28; 2332; 4213). But the Plan does not purport to have used any guidelines whatsoever.

84.   Although 29 C.F.R. § 2560.503-1 (h)(2)(iv)(3)(iii) permits a fiduciary to "consult" with health care professionals, here the Plan instead *deferred* all decision-making authority to MRI.

85.   Indeed, "[t]he Benefits Committee at the time Plaintiff's claim for benefits was determined at the final appeal stage are not in possession of medical credentials, including the following degrees: M.D., R.N., PhD (medical), N.P., or L.C.S.W." Lilienstein Dec. ¶ 4, Exhibit A.

86.   In failing to apply any medical analysis whatsoever to Plaintiff's claim, the Plan denied Plaintiff the full and fair review required under 29 C.F.R. § 2560.503-1 (h)(2).

87.   A plan will be found not to have provided a claimant with a full and fair review unless it "provide[s] for a review that does not afford deference to the initial adverse benefit determination. . ." 29 C.F.R. § 2560.503-1 (h)(2)(iv)(3)(ii). The Plan's wholesale deference to the original denial fails under any standard of review.

///

///

### I.   The Paper Reviews Conducted by Anthem and the Plan/MRI Are Conclusory, Contain No Analysis of R.C.'s Specific Circumstances, and Based Upon Obvious Factual Errors

88.   Well-settled law holds that the opinions of paper reviewers should be afforded less weight than treating physicians, all the more so when mental health treatment is at issue. *See, e.g. Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118, 1122-1123 (9th Cir. 1998).

89.   If discounting the opinions of the first paper reviewer is proper, so is discounting the opinions of the second through fifth non-examining reviewer, since none of them interviewed or spent time with the subject patient.

90.   Indeed, "[c]ourts discount the opinions of psychiatrists who have never seen the patient for obvious reasons. Unlike cardiologists or orthopedists, who can formulate medical opinions based upon objective findings derived from objective clinical tests, the psychiatrist typically treats his patient's subjective symptoms....

91.   [W]hen a psychiatrist evaluates a patient's mental condition, "a lot of this depends on interviewing the patient and spending time with the patient," ... *Smith v. Bayer Corp. Long Term Disability Plan*, 275 F. App'x 495, 508 (6th Cir. 2008) (overturning the denial of a long-term disability claim under the arbitrary and capricious standard of review).

92.   The court finds that  The opinions of five paper reviewers are no more valuable that the opinions of one paper reviewer, and do not warrant greater credit simply based on volume.  And where, as here, multiple medical reviewers set forth flawed reviews (whether based on a selective or incomplete review of the evidence), a denial of benefits is arbitrary and capricious. *Carrier v. Aetna Life Ins. Co.*, 2015 WL 4511620 (C.D. Cal. 2015); *Kreeger v. Life Ins. Co. of N. Am.*, 766 F.Supp.2d 991 (C.D. Cal. 2011).

93.   If this ploy worked, insurers could always tip the scales of justice in their favor, simply by stacking the deck with their own chosen non-treating, non-examining paper reviewers.

94.   It does not appear that any of these reviewers spent the time necessary to fully understand R.C.'s mental and behavioral health history or his need for treatment. Neither Anthem nor MRI, nor any of their paper reviewers, explained why their medical necessity determination differed from R.C.'s providers' opinions.

95.   Simply stating a contrary medical opinion, without explaining the basis for the difference from the treating provider, amounts to an arbitrary and capricious decision. *See Pacific Shores Hospital v. United Behavioral Health*, 764 F.3d 1030 (9th Cir. 2014)

96.   Here, the court finds that the Plan disregarded relevant medical evidence, and that such disregard is unreasonable under any standard of review: *See Salomaa,* 642 F.3d at 679.  *See also D.K. v. United Behavioral health,* 67 F.4th 1224, 1237 (10th Cir. 2023) (administrator who "arbitrarily refused to credit and effectively 'shut their eyes' to the medical opinions of [beneficiary's] treating physicians … acted arbitrarily and capriciously."

97.   As noted above, in addition to the opinions of R.C.'s providers, the daily treatment notes from Intermountain documented R.C.'s ongoing aggression, threatening behavior, and inappropriate sexualized behavior, sneaking out of his room at night and into a peer's room, hitting people, and threatening to kill people. DGA 96.

98.   Each of these incidents occurred weeks after the Plan stated that there was no evidence of risky behavior.  DGA 988; 97-101.

99.   The third-party reports on which the Plan's denials were based, along with the Plan's denial letters, are silent on these facts, even when they were included in Plaintiff's appeal. DGA 2350 – 4210.

100. The reports do not explain how the reviewer's conclusions can be reconciled with these incidents. The Plan's failure to credit these facts is an abuse of discretion.

101. Likewise, the failure of any of the reviewing physicians from the Plan to contact any of R.C.'s providers who submitted letters in order to discuss their difference of opinion—instead rendering their denial decisions based on purely paper reviews—is an abuse of discretion. *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBS Emps.*, 741 F.3d 686, 702 (6th Cir. 2014) ("[F]ile reviews are questionable as a basis for identifying whether an individual is disabled by mental illness."); *Okuno v. Reliance Standard Life Ins. Co.*, 836 F.3d 600, 610 (6th Cir. 2016) ("Evaluation of mental health necessarily involves subjective symptoms, which are most accurately ascertained through interviewing the patient and spending time with the patient, such that a purely record review will often be inadequate ....") (internal quotation marks omitted)).

102. *Andrew C. v. Oracle Am. Inc. Flexible Benefit Plan* is instructive. There, the administrator attempted to mount a similar defense, which was soundly rejected by the Court.  In rejecting the administrator's conclusory denials of the ERISA beneficiary's residential treatment claim, the court noted that "although [the administrator's] internal reviewers purport to have considered the medical records, therapy notes, and treatment plans from [the residential treatment center], their decisions only minimally acknowledge the contents of those records." *Andrew C. v. Oracle Am. Inc. Flexible Benefit Plan*, 474 F. Supp. 3d 1066, 1083 (N.D. Cal. 2020) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

103. That court also disapproved of the administrator "discount[ing] the [provider's] treatment records without explanation," *Id.* at 1086 (N.D. Cal. 2020).

104. Anthem's reviewers committed the same errors here, and for the same reasons, their reviews should be afforded very little weight by the Court.  ERISA

administrators and fiduciaries are required to engage in a "meaningful dialogue" with claimants.  The Ninth Circuit has described this meaningful dialogue as follows:

> If benefits are denied in whole or in part, the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis for the denial; if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. There is nothing extraordinary about this; it's how civilized people communicate with each other regarding important matters.

*Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997). Where an administrator issues denial letters "without a rational explanation" and "without even acknowledging [a claimant's] argument" in support of coverage, it fails to comply with this standard.  *Id.*

105. Regarding the purported peer-to-peer call conducted by Anthem, the court finds that actual notes from the referenced call are scant and further finds that Anthem's reviewer gave short shrift to the opinions of R.C.'s treater, who was the one who initiated the request for the peer-to-peer conversation. Anthem's all-too-brief summary of the call is a perfect example of cherry-picking information to justify a claim denial rather than considering evidence of R.C.'s many behavioral problems in the best light.

### J.  The Plan Improperly Afforded Deference to the Initial Adverse Benefit Determination

106. A plan will be found not to have provided a claimant with a full and fair review unless it "provide[s] for a review that does not afford deference to the initial adverse benefit determination. . ." 29 C.F.R. § 2560.503-1 (h)(2)(iv)(3)(ii).

107. The Plan itself guarantees an appeal review that will not afford deference to the initial denial. DGA 4400.

108. The court finds that the Plan merely rubber-stamped the denials of Anthem and MRI. The Plan admits that from 2019 to 2022, it is unaware of a single time "in which MRI's review of Anthem's claim denial involving care at a residential treatment center claim for members or subscribers of the Plan resulted in a complete overturn of the underlying denial from 2019 to 2021." Lilienstein Dec. ¶ 7, Exhibit B.

109. Additionally, the Plan admits to simply "deferring" its final appeal determinations to both MRI *and Anthem—the initial adverse benefit determiner.*

110. The Plan's discovery responses demonstrate that (1) MRI rubber-stamps Anthem's denials, (2) the Plan rubber-stamps MRI's denials, and (3) the Plan's decision-making role in the appeals process is nonexistent.

111. Because this process resulted in the Plan merely adopting the initial adverse benefit determination, the Plan violated Plaintiff's right to a full and fair review.

### K. The Plan Did Not Afford Plaintiff a Full and Fair Review Because It Changed Denial Reasons With Each Denial, and Used the Same Reviewer to Issue Both the Initial Denial and Appeal Denial

112. The court finds that Defendants' ever-shifting denial rationales violates ERISA, deprived Plaintiff of a full and fair review, and was both unreasonable and inaccurate.  The purpose of ERISA's administrative review process is to allow the parties the opportunity to debate and discuss the denial rationale.

113. When properly conducted, there is a meaningful dialogue between insurer and insured.  ERISA demands that plan and or claims administrators provide a full and fair review of a claims denial.

114. Part and parcel of this requirement is that the decisionmaker provide "[a] description of any material or information necessary for the claimant to perfect

the claim and an explanation of why such material is necessary." 29 CFR §2560-503-1(g)(1)(iii).

115. This is contrary to what occurred in this case, in which the Defendants repeatedly changed their denial rationale, ignored or dismissed Plaintiff's evidence, and failed to explain what specific evidence would be satisfactory.

116. The Plan's original denial rationale, by and through Anthem, was that R.C. "was not suicidal, homicidal, or psychotic." (Dkt. 84 at p. 10, l. 12 (citing ANTHEM 002270).

117. On appeal, Anthem focused only on the Intermountain treatment plan, which it concluded could be implemented at a lower level of care. This was apparently based on a peer-to-peer conversation, although the notes of that phone call make a mockery of note-taking.

118. Not only is it impossible to divine what the treatment plan was, it appears that the Anthem reviewer didn't even request supporting documentation of the supposedly inadequate treatment plan. Additionally, nowhere does the Plan define medical necessity as being based on a treatment plan.

119. The next denial was Orwellian in nature.  Suicidality and threats to others were no longer at issue. Nor was any treatment plan.  Instead, the reviewer admitted that R.C. need to be placed on multiple "holds," had "some" behavioral issues and "made threats to another patients family." ANTHEM 66-68.

120.  Nowhere does any Plan document set forth a specific number of holds, or how many behavioral issues, or how many threats to others would be required to justify 24-hour care.

121. Nor did the Plan explain, or even consider, how R.C.'s family could function with a son who required multiple "holds," who did not respond positively to redirection and who was threatening others.

122. The MRI review was next. Now persistence was the barometer. Only a persistent risk of risk or harm to self or others or "significant aggression or

threatening behavior," would meet the bar for a residential treatment level of care. DGA 2332-4.

123. The court finds that what constitutes "persistent" or "significant" is never defined, and Plaintiff received no guidance as to what documentation could satisfy this subjective requirement of persistency, something that is not part of the plan definition of medical necessity.

124. Two weeks later the same doctor, Dr. Holmes, performed another review.  This alone violates ERISA's requirement that a subsequent review shall not be done by "an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual. . . ." 29 CFR §2560.503-1(h)(3)(v).

125.  Dr. Holmes changed his opinions now setting the bar at "evidence of severity of depression or mania" or "evidence of a thought disorder. . . ."  DGA 4214. This was the first time severity of depression (another subjective criterion) or mania ever appeared as a denial rationale, and the presence of a thought disorder appears nowhere in any plan document or guideline.  Defendants, via Dr. Holmes, simply made it up to justify the claim denial.

126. Given their line of reasoning and review, first R.C. had to be suicidal or homicidal to justify inpatient care at a residential treatment center. Then the treatment plan wasn't sufficient to justify this level of care.

127. Subsequently, there were not enough documented holds and threats to others.  Then R.C.'s aggressive and threatening behavior was not significant enough. And, finally, it was R.C.'s depression, mania or thought disorders were insufficiently severe.

128. These shifting sands of denial rationales make a mockery of any administrative review process, and evidence the Plan's violations of ERISA's claims handling requirements.

129. The Plan's reliance on *McIlhaney v. Anthem Life Ins. Co. Long Term Disability Plan*, 2010 WL 317430 (C.D.Cal. 2010) is also misplaced.

130. As in *Montour*, *supra*, the court found for the plaintiff and against the administrator. The claims handling process herein is a far cry from the Plan's characterization of it as "reasonable and entirely customary."

131. The court finds that there is nothing reasonable and customary about a process in which a plan participant's claim is never overturned on appeal. This is the case here. Nor did the Plan or its Benefits Committee seek "input" from third parties—it farmed out all decision making to an entity is uses repeatedly and one that never in two years and seventeen reviews found a problem with a claim denial, and then adopted the decision of the third-party.

132. Nor was there a thorough review: the benefits Committee did not review the appeal or apply any criteria.

133. *C.P. v. United Healthcare Ins. Co.*, 2023 WL 4108368 (D.Ut. June 21, 2023) is instructive. *C.P.* involved a denial of inpatient care at a residential treatment facility, albeit on the basis that the facility was not properly licensed. The insurer "repeatedly ignored Plaintiff's arguments and evidence at to . . . treatments . . . and failed to communicate the bases for its denials to Plaintiff." *Id.* at *5.

134. The court finds that the Plan and its reviewers repeatedly changed denial rationales and failed to explain what evidence it reviewed.

135. The court in *C.P.* noted that "under ERISA, a plan administrator 'cannot shut its eyes to readily available information that could confirm a beneficiary's entitlement to benefits, and, if it does so, it has acted arbitrarily and capriciously." *Id.* (citing *D.K. v. United Behavioral Health*, 67 F.4th 1224, 1237 (10th Cir. 2023) (internal quotations omitted).

136. Health plan "reviewers violate[] ERISA where they [do] not engage with the material submitted by plaintiff and provide[] cursory statements without

any indication how they reached their conclusion." *Id.* (citing *David P. v. United healthcare Ins. Co.*, 564F.Supp.3d 1100, 1117-20 (D. Utah, 2021).

137. The Plan and its reviewers glossed over any specifics concerning R.C.'s behavior and treatment history.  Rather than discussing what R.C. did to require being repeatedly put in "holds," the Plan's reviewers only considered the frequency of the holds. Rather than considering what violent actions R.C. engaged in, Defendants' reviewers concluded that the actions were not violent enough.

138. The Plan's everchanging denial rationales deprived Plaintiff of his right to a full and fair claim review. No sooner had Plaintiff rebutted one appeal rationale than the Plan changed course and asserted a new rationale. Plaintiff never had a chance.

## L.  The Plan Breached Its Fiduciary Duties by Deferring All Decision Making to MRI With No Oversight or Quality Control

139. ERISA provides that fiduciaries shall discharge their duties with respect to a plan "solely in the interest of the participants and beneficiaries," [29 U.S.C.] § 1104(a)(1), that is, "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan," § 1104(a)(1)(A).

140. Fiduciaries must discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

141. The Plan's cursory reviews were unreasonable.  "An ERISA fiduciary presented with a claim that a little more evidence may prove valid should seek to get to the truth of the matter." *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 808 (10th Cir. 2004). This is precisely what the Plan and its reviewers failed to do herein.  It also helps explain why not one plan participant had a residential treatment denial overturned on appeal for at least two years.

142. Such faulty claims handling is a *sine qua non* of the Plan's breach of fiduciary duty toward Plaintiff and R.C.

143. The ERISA implementing regulations applicable to *both* group disability and health care claims also require that the adverse notification "shall set forth … (i) the specific reason or reasons for the adverse determination . . . (iii) a

144. Not one of the Plan's denials complied with these statutory and regulatory requirements.  In addition to the ERISA statute and regulations, ERISA is a creature of common law.  Courts have stated repeatedly:

> "An ERISA plan administrator who denies a claim must explain the 'specific reasons for such denial' and provide a 'full and fair review' of the denial. 29 U.S.C. § 1133. The administrator must also give the claimant information about the denial, including the "specific plan provisions" on which it is based and "any additional material or information necessary for the claimant to perfect the claim." 29 C.F.R. § 2560.503–1(g).

*Harlick v. Blue Shield of California*, 686 F.3d 699, 719 (9th Cir., 2012) (reversing Blue Shield's denial of claimant's residential treatment claim).

145. The court finds that the Plan used a conflicted and unqualified third-party reviewer.

146. MRI issued a report that was so terse and willfully devoid of any engagement with the medical evidence concerning R.C.'s history and symptoms, that it appears likely the reviewer did not even read Plaintiff's appeal.

147. The Plan's own discovery responses acknowledge that it did not review or supervise MRI's decision-making processes or conduct any quality control oversight on MRI's conduct.

148. The Plan breached its fiduciary duty by rubber-stamping MRI's denial decision without conducting any independent analysis or evaluation of the appeal.

149. The Plan further acknowledged that neither its medical director nor any of the Board of Trustees or Benefits Committee members have any training,

expertise or Board Certification in mental and or behavioral health that would qualify them to deny mental health claims or to opine on medical necessity.

150. The court finds that the Plan defers all mental health decision-making to MRI, and consequently rubber-stamps its decision.

151. The Plan does not conduct its own medical necessity analysis and does not even reference any clinical guidelines to evaluate appeals.

152. The Plan's failure to discharge it duties, and its failure to hold MRI to any standard of care in reviewing claims such as Plaintiff's, is a breach of its fiduciary duties under ERISA. 29 U.S.C § 1104.

153. The court finds that, for the reasons set forth above, the record demonstrates by more than a preponderance of the evidence that R.C.'s residential treatment was medically necessary under the terms and conditions of the Plan.

Dated:  December 13, 2023              Respectfully submitted,
                                       **DL LAW GROUP**


                                       By:   */S/ David Lilienstein*
                                        David M. Lilienstein
                                        Katie J. Spielman

**PLAINTIFF'S [PROPOSED] FINDINGS OF FACT AND LAW**          Case No. 2:22-cv-03647-FLA-AFM